Ray C. HARVELL., Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13319.

Court of Criminal Appeals of Oklahoma.

July 22, 1964.

Rehearing Denied Sept. 23, 1964.

See also 372 P.2d 883.

R. O. Ingle, Green & Green, Sallisaw, for plaintiff in error.

Charles Nesbitt, Atty. Gen., Jack A. Swidensky, Asst. Atty. Gen., for defendant in error.

JOHNSON, Presiding Judge.

On May 28, 1962 the county attorney of Sequoyah County filed an information in the district court of said county, charging the plaintiff in error, Ray C. Harvell, with the crime of "first degree murder", in that he shot and killed one Samuel R. Pleasant on May 21, 1962. The plaintiff in error, hereinafter referred to as the defendant, was tried to a jury, and convicted of manslaughter in the first degree, the jury fixing his penalty at sixteen years in the State Penitentiary. Judgment was rendered on September 24, 1962, and petition in error with casemade was duly filed in this Court.

In the petition in error counsel for defendant set out nineteen assignments of error, and in their brief argue them under four general heads:

I. The court erred in overruling defendant's motion to quash and set aside information.

II. The conviction should be reversed because of the misconduct of the county attorney (A, B, C).

III. The verdict should be reversed because of errors of the court in denying evidence offered by defendant, and by allowing incompetent evidence offered by the State (A, B).

IV. The verdict was contrary to the law and the evidence.

The Attorney General answers each of these assignments in the order set forth.

The facts in this case are substantially as follows: The defendant, 19 years of age, was in the Army in May, 1962, stationed at Ft. Bragg, North Carolina, a paratrooper with the 82nd Airborne division. On the date of this tragedy he was at his home in Muldrow, Oklahoma, on leave, having left Ft. Bragg on May 14, 1962 and hitchhiked to his home.

The testimony of the defendant shows that on the morning of May 21, 1962, this defendant got up about 11 o'clock in the morning, and went to town, and later drove to Ft. Smith, Arkansas, a distance of about ten miles, to see something about his leave,

and then returned to Muldrow. About 3 or 3:30 that afternoon, the defendant and his brother Carlos took a .22 calibre pistol (45 frame, nine-shot) from the glove compartment of their father's car, and placed it under a blanket covering the front seat of the car, and started to go squirrel hunting. Before they got out of town they met some friends of the brother, and he got out of the car, and defendant went on hunting alone. He went into some woods and stayed about half an hour, and shot the gun three times, but seeing no squirrels, returned to town, and met his father, who asked him to go for some milk. Defendant and a younger brother, Ewing, went for the milk. Defendant then took a friend, Ronnie Morgan, to his home about a mile from town, and spent about an hour there, and he and the friend fired the gun several times at cans. He testified that he had seven shells in the gun when he left the Morgan home. That he put the gun back under the blanket on the seat of the car, went back to town, purchased $1 worth of gas and started from Muldrow to Ft. Smith for the purpose of picking up a cousin to bring him to Muldrow to spend the night.

As the defendant was leaving the filling station he picked up a hitchhiker, an elderly man who, as it developed, was Samuel R. Pleasant. Defendant testified that just after getting out of Muldrow, the man pulled out a bottle of wine from under his coat and offered defendant a drink, which he refused. He testified that the hitchhiker then asked him for "a couple of dollars", and defendant told him he did not have any money. Defendant testified that he was driving about 40 miles an hour, but after the man had taken several drinks of the wine (offering defendant a drink each time, which he refused), he became suspicious, and speeded up his car to about 60 miles. Defendant testified:

"A Well, we went up and we got about two miles west—west of Fort Smith, Arkansas and he pulled a bottle out and offered it to me again, and I said, 'No, buddy, I told you that I didn't drink that stuff.' And he took another drink from it and put it away. And I speeded on up a little more.

"Q. Did he say anything then? A When he offered me the drink and I told him I couldn't drink the stuff, it would make—it would make me sick, and he said, 'Old Smart Boy.'

"Q 'Old Smart Boy'? A Yes, sir, and then he put that bottle back away.

"Q And what did he do after he said that? A Well, he took another drink.

"Q All right. A And then he put his bottle away, and I speeded up again and I was watching the road, and I glanced over there and he had his knife out and was coming at me with it.

"Q He had a knife and was coming at you with it? A Yes.

"Q. Now, when was the first time you saw the knife? A When he had it out and was coming at me with it.

"Q In which hand did he have it? A His right hand.

"Q His right hand? A Yes.

"Q How was he holding it? A Like this (indicating).

"Q You say he was coming at you with it? A Yes, sir; he was coming around like that (indicating).

"Q All right. Did he say anything? A Not to me that I heard him say. He just looked wild.

"Q And what did you do? A Well, when I seen that knife, I hit my brakes and grabbed for the door handle, and they was broke, and at the same time I was getting my pistol out from under the seat, and when he went up against the dash, I looked over that way and he come back up with that knife and that's when I shot him.

"Q All right. Now how many times did you shoot then? A Just one I shot then, and I was still trying to get that door open and I glanced back over there, and when I glanced back over

there, he was coming up again. And so I shot again.

"Q Ray, was your life in danger at that time? A Yes, sir.
"Q Would you have shot him if you thought your life would not be in any danger? A No, sir.

"Q How many times did you shoot? A I don't know.

"Q Were you excited? A Yes, sir. I was scared to death."

This occurred about 6 or 6:30 in the afternoon. Defendant turned his car around and started back toward Muldrow, but turned on to the river road and drove to a high bluff known as "Wilson's Rock", pulled the body out of his car and pushed it over the cliff (between 15 and 30 feet) into the Arkansas River. He then got in his car and started to Muldrow. On the way he remembered that the deceased had placed a small bag back of the front seat when he got in the car, and defendant stopped on the road near some houses, and testified that he reached over the back seat and picked up the bag, and when he did, it came open and some "stuff" fell out—a rag and some letters. There was a considerable amount of blood on the floor of his car, and he wiped the blood up with the rag, and threw the bag, the floor mat from his car, and the blanket across the bar-ditch into some vines on the side of the road, wiped the blood up with the rag (which, it developed was an undershirt) and threw it across the ditch. He saw a bill-fold and "grabbed it up and threw it across the fence". It was covered with blood, and he did not look into it. He started up, and discovered that he had a flat tire, so he drove on the shoulder of the road on to Muldrow and stopped at Powell's filling station, where he saw his friend Johnny Powell, and asked if he had seen his father. He then told Johnny Powell that he had to find his father, that he had "killed a fellow up the road and I had to get hold of Dad and get him out of the water." This was the first person defendant had seen. Powell did not have a spare tire defendant could use, and told him to drive his car on home, and he would follow, and they would go look for his father. Before they got to defendant's home they met his brother Carlos (who owned the car defendant was driving) and defendant asked him to drive the car on home, and told Carlos what he had done, and asked about his father. He got in the car with Johnny Powell and they drove out on the highway, looking for the father, past the place where he had dumped the bag, etc., he pointed it out to Johnny, and they went back to Muldrow, got a spare tire for his brother and took it home, and defendant was changing his clothes when the deputy sheriff came looking for him.

In the meantime, people living near the place where the bag, floor mat and blanket had been dumped, who had seen the articles thrown over the ditch and had taken the tag number of defendant's car, had contacted the deputy sheriff, who went to the home of defendant and picked him up; found the defendant's father, turned the defendant over to the marshal to be taken to the county jail; and the father, deputy sheriff and a number of other men went to the river to look for the body. They drove to Wilson's Rock, and saw the body in the river, caught in some brush, and were successful in recovering it.

The testimony in this case covers more than 500 pages, the state used 23 witnesses and recalled several of them two of them three times, and introduced 32 exhibits. The defendant had 30 witnesses, 27 of them being character witnesses.

The opening and closing statements of the county attorney are incorporated in the record, but neither the opening nor the closing statement of the defendant is shown.

Defendant's first proposition is that the court erred in overruling his motion to quash and set aside the information. This proposition is based on the fact that the information was not sworn to by the county attorney. As authority for the complaint,

defendant quotes Title 22 O.S.A. § 303, the last sentence of which reads:

"All informations shall be verified by the oath of the prosecuting attorney, complainant or some other person."

Defendant in his brief states that the courts have followed the old cases, rather than the statutes, and ignored the last sentence of this section of the statute, quoted above.

In passing upon the motion to quash and the demurrer, the trial court said:

"Where a verification has been signed in the preliminary information, it is not necessary to sign it in the district court. Very well. The demurrer will be overruled and the motion will be overruled and exceptions allowed."

▮ The record before us does not include the original complaint, or any of the proceedings in the court of the committing magistrate. In the absence of such files, it will be assumed by this Court that the same were regular and in proper order, and that the magistrate acted with authority. However, in Steiner v. State, 33 Okl.Cr. 298, 243 P. 1002, this Court held:

"Where an unverified complaint charging a felony is filed before a magistrate, it is insufficient to authorize the issuance of a warrant, but, if a warrant is issued on such complaint, and a defendant apprehended and arraigned and submits to the jurisdiction of the magistrate, and has a preliminary trial on such complaint without challenging its sufficiency for lack of verification, such defect is waived."

In 42 C.J.S. Indictments and Informations § 11, pg. 851 it is said:

"The office of an information is not only to give the court jurisdiction, but also to inform accused of what offense he is charged, so as to enable him to prepare his defense. It is in the nature of, and takes the place of, an indictment; but it differs therefrom in the source from which it emanates; an indictment is presented by a grand jury on their oath, while an information is presented by a public prosecuting officer *on his oath of office*. (Emphasis now supplied)

▮ In the early case of Stamper v. State, 25 Okl.Cr. 324, 220 P. 67, this Court said:

"The verification of an information charging a felony is no part of the information itself, and is not an indispensable requisite."

▮ In Simpson v. State, 24 Okl.Cr. 275, 217 P. 1054, the syllabus reads, in part:

"There is no necessity that an information in a felony case be verified by the oath or affirmation of any person.

"It is the fact that there was a preliminary examination or waiver thereof and a judicial determination thereon by the examining magistrate, that a felony has been committed, and that there is probable cause to believe defendant guilty thereof, that confers jurisdiction on the district court and authorizes the county attorney to file an information in said court charging the crime committed according to the facts in evidence on such examination; or for the offense charged in the preliminary information when such examination has been waived.

"Where an information in a felony case is signed by the county attorney and is styled as required by the Constitution and the statutes of the state, and it appears from the face thereof that it is an official presentment by information of the county attorney filed in the trial court, the failure to state in the body of the information that the same is presented by the county attorney 'upon his official oath' does not render the information fatally defective."

This Court has proceeded for many years upon the theory that verification is not part of the information in a felony case, or is not an essential or substantial part thereof,

but is merely to insure good faith in instituting the proceedings; that where the original complaint is sworn to, it is not necessary for the county attorney, under his oath of office, to swear to the information; and that the absence of the required verification is at best only a formal defect in the information, and does not render the information void or deprive the court of jurisdiction. Brown v. State, 9 Okl.Cr. 382, 132 P. 359; Hughes v. State, 7 Okl.Cr. 117, 122 P. 554.

There is no contention here that the defendant was not granted a preliminary examination. The contention urged is that the information was not sworn to by the county attorney, and while we think it would certainly be the better practice for the county attorney to swear to any and all informations filed, we do not consider the fact that the county attorney failed to swear to the information in this case is fatal. This contention is too technical to merit further consideration, especially where it is not contended that the proceedings preliminary to the prosecution of the felony case by information were not complied with.

Defendant's second proposition is that the conviction should be reversed because of the misconduct of the county attorney by reason of the prejudicial statements made by her in her opening argument. The remarks complained of are as follows:

(1) "But a crime has been committed here and it is my duty and it is your duty to see that some kind of justice is meted out.

(2) "As you can see the State doesn't have an oversupply of attorneys, as the other side does.

(3) "The state will show you that he was broke; he had $1.50. He made various attempts at various places to obtain money. He was unsuccessful in all of those attempts.

(4) "He had made no effort to get help for the crime that he had committed. He disposed of the body, which was another crime.

(5) "They tore the seat covers up trying to destroy the evidence, they tore part of the door off trying to destroy where the bullets had gone; that then after the brother had washed the car and the defendant himself went out and again washed it."

Counsel state: "all of these statements were made in bad faith and were made solely for the purpose of prejudicing the minds of the jury; the State did not attempt to prove that the defendant ever tried to borrow any money; they did not prove or attempt to prove that 'they' tore up the seat covers trying to destroy evidence and did not attempt to prove that 'they' tore part of the door off trying to destroy where the bullets had gone", etc.

The first statement complained of, that "it is my duty and your duty to see that some kind of justice is meted out", we do not consider prejudicial. The jury was aware that she was the prosecuting attorney, and understood their duty in the case; and the statement that the State "doesn't have an over supply of attorneys, as the other side does" was certainly unnecessary but we are of the opinion that it did not prejudice the jury.

The third statement was made that the defendant was broke, had only $1.50 and that he made various attempts at various places to obtain money and was unsuccessful in all of those attempts. The County Attorney made no attempt whatever to prove that the defendant was broke, except his own statement that he had only $1.45 in his pocket, and she offered no proof that he had attempted to borrow any money from any person.

While it is the duty of counsel in making an opening statement to state the facts fairly, and to refrain from stating facts which he can not or will not be permitted to prove, the mere violation of the rule by a prosecuting attorney is not of itself evidence that he acted in bad faith, and does not constitute reversible error. The conclusion of the Court is that such

overstatements react upon the party making them, rather than injuring the party against whom they were made. The county attorney made a number of statements throughout the trial that were entirely uncalled for and which she should not have made, but from the results, we are of the opinion that such statements did not influence the verdict.

■ The County Attorney's statement that defendant disposed of the body "which was another crime", was error, but we do not consider it of sufficient importance to justify a reversal of this case. Her statements that they tore the seat covers up trying to destroy the evidence, and tore part of the door off trying to destroy where the bullets had gone were not borne out by the evidence.

■ In order to constitute reversible error, the impropriety indulged in must have been such as may have influenced the verdict. In this case, we are of the opinion that the verdict returned shows that no injury was suffered by the accused. We consider these assignments hypercritical. Attorneys for defendant state that "All of her other acts throughout the trial show that she was in bad faith and it was not ignorance which caused her to make these statements." We do not agree that the county attorney displayed bad faith in her handling of the trial of this case.

Defendant next contends that the conviction should be reversed because of the actions of the county attorney in repeatedly asking incompetent questions.

■ There are any number of questions and comments by the county attorney that legally and technically are incorrect and improper, but we agree with the Attorney General that the majority, if not all, of the questions and comments of which the defendant complains are immaterial, and could not have influenced the jury in this case. It is not error alone that reverses judgments of conviction of crime in this State, but error plus injury, and the burden is upon the defendant to establish to this Court that he was prejudiced in his substantial rights by the commission of error.

Defendant complains of the actions of the county attorney in making statements that the defendant was guilty, and of her misconduct in her closing argument.

The specific statements complained of were: "He killed in cold blood. He did it with malice. He did it unlawfully. He did it unjustly. He has admitted all of those facts."

■ No objections or exceptions were taken to these remarks in the closing argument of the county attorney. In the case of Hill v. State, 76 Okl.Cr. 317, 137 P.2d 261, cited by the defendant as authority, this Court said:

"A prosecuting attorney should confine his argument before the jury to a fair discussion of the issues in the case, and improper remarks *objected to at the time* (emphasis now supplied) will be considered and construed in reference to the evidence. If it appears that the improper argument may have determined the verdict, the judgment will be reversed."

■ In Hathcox v. State, 94 Okl.Cr. 110, 230 P.2d 927, we said (quoting Peters v. State, 71 Okl.Cr. 175, 110 P.2d 300):

"Counsel for a defendant must not only object to improper statements of the county attorney in his argument to the jury, but he must go further and move the court to exclude such remarks from the jury and instruct them not to consider them for any purpose, unless the remarks were of such a character that the error would not be cured by a withdrawal of the remarks."

And see Disheroon v. State, Okl.Cr., 357 P.2d 236; Grimes v. State, Okl.Cr., 365 P.2d 739.

■ The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration and argumentation is wide. Counsel for both the State and the defendant have a right to discuss fully from their standpoints the

evidence and the inferences and deductions arising therefrom. It is only when argument by counsel for the State is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument. Easterling v. State, Okl.Cr., 267 P.2d 185; Mooney v. State, Okl.Cr., 273 P.2d 768; Disheroon v. State, Okl.Cr., 357 P.2d 236.

The defendant complains of errors of the court in denying evidence offered by defendant and by allowing incompetent evidence offered by the State.

He specifically complains of error of the court in denying evidence of one of the attorneys for the defendant, R. O. Ingle.

Mr. Green, one of the attorneys for the defendant, called as a witness the other attorney, R. O. Ingle. Objection was made by the county attorney for the reason that the rule had been asked, and Mr. Ingle had been in the court room throughout the trial. The court, after stating that he had not had this question up before, decided that Mr. Ingle could not testify. Mr. Green asked if the testimony could be offered in rebuttal, and the trial court agreed that it could. In a statement to the court, in the absence of the jury, Mr. Green stated that Mr. Ingle would testify that on the morning of May 21, while travelling from Spiro (presumably to Sallisaw) he picked up a hitchhiker, who, after viewing the body of the deceased Pleasant, he identified as the hitchhiker.

The Court can not understand the value of this testimony. Mr. Green, in making the offer, stated that it was offered as testimony in chief, and also as rebuttal to the State's witness A. J. Rigney. The offer was denied, and exceptions allowed. A. J. Rigney had testified that he made a trip to Muskogee on the day in question, and returning to Checotah he picked up a hitchhiker somewhere around noon, described as "an old man, who was crippled." Mr. Green objected to this testimony, saying, "In the first place, I do not know what this has to do with this case,

unless they can identify it and connect it up some way, why it is incompetent." The objection was sustained, and the witness excused. We see no reason to place Mr. Ingle on the stand to rebut this testimony, which was not permitted to go in. There is no question about this defendant having picked up Mr. Pleasant in Muldrow between 5:30 and 6:00 o'clock in the afternoon of the day in question. He was a hitchhiker, and we do not see that it made any material difference who had picked him up and given him rides early in the day. We are of the opinion that the testimony of Mr. Ingle was immaterial.

Defendant contends that the witness Curtis Brown was allowed to testify as an expert witness. This witness testified that he was a licensed embalmer and funeral director, and a special investigator for the county attorney's office. He testified that his training included anatomy, physiology, pathology and bacteriology. This witness had testified that he was present when the body of Mr. Pleasant was pulled out of the water, and at that time he saw five bullet holes in the body. That later, at the funeral home, he undressed the body, and there were nine bullet holes. However, the particular question and answer complained of in this connection were as follows (direct examination by the county attorney): "Q What did you find as you examined him? A To my knowledge he died of gun shot wounds."

Mr. Green interposed an objection and it was sustained. The county attorney then called Dr. Bob G. Mitchell, who testified that he was called to the funeral home and checked the body only to determine that the man was dead.

Curtis Brown was recalled, and the following took place:

"Q Mr. Brown at the time that you had the body of Mr. Pleasant at the funeral home, will you tell us what examination you made of the body? A I opened the chest cavity.

"Mr. J. Fred Green: Wait a minute. Now I want to make a record.

"The Court: All right.

"Mr. Green: Comes now the defendant and objects to the line of testimony from this witness, this as to opening the chest cavity, and an autopsy which he is supposed to have performed, for the reason that he is not a competent, qualified witness to make such an examination. And if he did make such an examination, he's not a competent and qualified witness to testify as an expert on that line and to testify as to what he did or testify to the results of what he found.

"The Court: Overruled and exception allowed."

■ In Bingham v. State, 82 Okl.Cr. 5, 165 P.2d 646, this Court in defining expert witness, said:

"An expert witness is one possessed of scientific knowledge acquired by study or practice or by both study and practice, and is, ordinarily, a person who has experience and knowledge in relation to matters which are not generally known to the people."

■ And further:

"The weight and credibility of the opinion of the expert is a question for determination of the jury."

■ And in Pruitt v. State, Okl.Cr., 290 P.2d 424, certiorari denied 351 U.S. 913, 76 S.Ct. 703, 100 L.Ed. 1446, we held:

"The general rule is that the question of competency of a witness to testify as an expert is largely a matter of discretion for the trial court and it requires clear proof of error to warrant a reversal by the appellate court on such matters."

■ The admissibility of this evidence, and the sufficiency of the qualification of this witness was a question largely addressed to the sound discretion of the trial court.

■ In 23 C.J.S. Criminal Law § 878, p. 458, we find the following:

"It has been held that a witness need not be a practicing physician, or a member of a profession to which opinion evidence of such character is necessarily confined, in order to give such testimony as an expert. Consequently, a witness other than a practicing physician, who is not qualified as such to testify as to cause of death, may, by training, study, and experience, or familiarity with the subject, be deemed sufficiently qualified to give such testimony as an expert; the sufficiency of his qualifications is a question largely addressed to the sound discretion of the trial court. Thus, a coroner, embalmer, pathologist, registered nurse, toxicologist, or, in the case of poisoning, a chemist or an expert in toxicology and chemistry, may be permitted, when shown to be sufficiently qualified, to testify as to the fatality of a wound or other cause of death."

This defendant told several people that he had killed this deceased, admitted that he shot him, he didn't know how many times; and further testified, on cross examination:

"A I stopped the car and got out and went around to the other side and got him and threw him in the river.

"Q How did you do this? A By his arms.

"Q Was he dead then, as far as you know? A Yes, ma'am.

"Q Was he bleeding pretty bad there or not? A Not too bad then.

"Q What did you do then? A I took him over and put him in the water."

Defendant's final contention is that the verdict was contrary to the law and the evidence.

The theory of the prosecution was that this was a deliberate murder, with robbery the aim. That of the defense, justifiable homicide in self defense.

■ Where the uncontroverted evidence on the part of the State establishes the guilt of the accused beyond a reason-

able doubt, error of the court in the admission or rejection of evidence will not require a reversal unless upon examination of the entire record it is apparent that such admission or rejection resulted in a miscarriage of justice or deprived the accused of some constitutional or statutory right. See Pierce v. State, Okl.Cr., 358 P.2d 647; Bird v. State, Okl.Cr., 362 P.2d 117; Williams v. State, Okl.Cr., 364 P.2d 702; Glass v. State, Okl.Cr. 361 P.2d 230.

There is practically no conflicting evidence in this case. Counsel for defendant in their brief state "If the defendant is guilty under his statement, then he is guilty; if he is not guilty by his own statement, then he is not guilty."

▇ The jury, properly instructed (no objections or exceptions were made to any of the instructions, and no additional instructions offered by the defendant) found the defendant guilty of the included offense of manslaughter in the first degree. The jury evidently took into consideration all of the facts and circumstances when they returned their verdict of manslaughter in the first degree and fixed defendant's sentence at sixteen years in the penitentiary. From the evidence of the State, they could have found the defendant guilty of murder. He was a young man, nineteen years of age, a paratrooper in the United States Army, and no doubt in good physical condition, and the only way he found to defend himself when he saw his passenger had a knife, was to shoot him. By his own testimony he was driving about 40 miles an hour, and was two miles west of Fort Smith, Arkansas when the deceased offered him a drink from his wine bottle, and he became scared and "speeded on up" to about 60 miles. The deceased took another drink of wine, and defendant speeded up again, glanced over and saw the deceased had his knife out and "looked wild". He testified, and there was further proof, that the door handles on the inside of the car were broken and could be opened only from the outside; that he attempted to open the door from the outside on his side of the car, and at the same time reached for his gun, which he had testified was under the blanket covering the front seat of the car, and they must have been sitting on the blanket.

We have given this case that careful study which its importance demands, and have considered all the alleged errors argued, and given due weight to every proposition urged by counsel for defendant. The prosecution of this case was handled in a most unusual manner throughout. As an example, the county attorney had a number of exhibits that she wanted to introduce. After several objections were made and sustained to the manner in which these were being offered, the defense attorney stated: "I'll help you get it into evidence, if you want me to." The county attorney declined this offer, but later, after further objections, the court said, in answer to a question by the county attorney, "I understand, but there's one way of doing it. Mr. Green indicated he'd help you if you wished." The county attorney then answered: "All right. Let's have some help" and the attorney for the defendant proceeded to offer the State's exhibits in evidence.

Upon a consideration of the entire record, we find the case was fairly tried. We think the trial court made every effort to keep the record straight. As hereinbefore stated, while there are numerous errors in the record, it is our opinion that none of them are of sufficient importance to warrant a reversal of this case. The defendant was ably defended, as evidenced by the verdict returned.

After a careful examination and consideration of the entire record, we are of the opinion that the defendant had a fair and impartial trial, and that no fundamental error was committed prejudicial to his substantial rights.

The judgment and sentence of the district court of Sequoyah County is affirmed.