Michael Wayne BROWN, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–668.

Court of Criminal Appeals of Oklahoma.

April 28, 1977.

Thomas W. Burns, Deputy Chief Public Defender, Clarke L. Randall, Appellate Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Douglas L. Combs, Asst. Atty. Gen., for appellee.

## OPINION

BUSSEY, Presiding Judge:

Michael Wayne Brown, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Tulsa County, Case No. CRF–75–1297, for the offense of Murder in the First Degree, in violation of 21 O.S.Supp.1974, § 701.1. Defendant was sentenced to death, and from said judgment and sentence a timely appeal has been perfected to this Court.

At trial, Mrs. Richard E. Sullivan, wife of the deceased, Richard E. Sullivan, testified that on May 14, 1975, her husband was employed as an insurance investigator for M.F.A. Insurance Company. She and her daughter, Terese, went with her husband that evening to his office at 2305 South Sheridan, in Tulsa, Oklahoma. He went into his office to pick up a file and she and her daughter remained outside in the parking lot. She became concerned when he did not return and drove to the back of the building. She observed a window had been broken out. She then drove to the side of the building, looked through a window, and noticed that things were scattered about in one of the offices. She observed an officer across the street in a car and asked him if someone could check on her husband. Two police cars arrived shortly thereafter. She had a conversation with the officers and one of them went into the building. He returned and informed her that her husband had been shot.

Officer David Kruthof testified that on May 14, 1975, at approximately 11:00 p. m., he responded to a call to see a security guard at the Goodyear lot across the street from the M.F.A. Insurance Company. He had a conversation with the guard who pointed to a car parked in the M.F.A. parking lot. He proceeded to the parking lot and had a conversation with Mrs. Sullivan. Thereafter, he began checking the windows of the building and observed a man on the floor inside a hallway. He and his partner entered the building through a back door and proceeded to the location where he had observed the body. Upon observing a spot of blood on the man's shirt, he went outside

and radioed for an ambulance. He continued to check the building and observed that one of the back windows had been broken out. He identified certain photographs as accurately depicting the building on the evening in question.

Officer Ira Ralston testified that on the evening of May 14, 1975, he also responded to the call to see the security guard. His testimony thereafter did not differ substantially from the testimony of Officer Kruthof. He checked the man's pulse at his wrist and neck and detected no signs of life.

Sergeant Tom Lewallen testified that he was in charge of the Identification Bureau of the Tulsa Police Department. He identified a brown paper box which he sent to the Federal Bureau of Investigation in Washington, D.C., and which he subsequently received back through the mail on September 17, 1975. The box contained State's Exhibit No. 1, a .22 caliber automatic pistol; State's Exhibit No. 2, a bullet; and State's Exhibit No. 3, a .22 caliber cartridge case.

The parties stipulated that if Dr. Leo Lowbeer were called as a witness, he would testify that as a forensic pathologist at Hillcrest Medical Center, he had performed an autopsy on the deceased and had found a gunshot wound at the back of the head. He would further testify that in his opinion the cause of death was a bullet perforation of the left subclavian artery.

The parties entered into three additional stipulations, the first being that if Mike Hickman were called he would identify State's Exhibit No. 1 as being a .22 caliber automatic pistol which he bought from co-defendant Dennis Woodward for approximately $20.00. He gave the pistol to his attorney, Mallie Norton, in payment for an attorney fee.

The next stipulation was that if Mallie Norton were called, he would identify State's Exhibit No. 1 as a pistol he had obtained from Mike Hickman. He turned the pistol over to the Police Department and it was subsequently submitted to the F.B.I. Laboratory.

The final stipulation was that if Robert Siebert, agent with the F.B.I. Laboratory, were called, he would testify that he received State's Exhibit No. 1, the pistol; State's Exhibit No. 2, a bullet; and State's Exhibit No. 3, a spent shell casing, in the mail from the Tulsa Police Department. It was further stipulated that he would testify that after conducting certain tests, it was his opinion that State's Exhibit No. 3, a .22 caliber cartridge case, had been fired by State's Exhibit No. 1, the .22 caliber automatic pistol. He could not give definite testimony concerning whether or not the bullet had been fired by State's Exhibit No. 1 because of the bullet's mutilation.

James Brown testified that he was a Tulsa Police Officer assigned to the Identification Division. He identified certain photographs as being those which he had taken on the evening of May 14, 1975.

Donald Barnett testified that he was sixteen years of age and was in the tenth grade at Nathan Hale High School. On May 14, 1975, at approximately 8:30 p. m., the defendant, Dennis Woodward and Delores Strange came to his home. They started talking about needing money and going out and burglarizing a place. Defendant asked him if he wanted to go along, but he declined because he was on probation. They left at approximately 9:30 p. m. Defendant returned about midnight and invited him to go out to get something to eat. They went to Denny's Restaurant at Sheridan and Admiral Place and when they finished their meal, defendant paid the bill. Defendant told him on the way home that he, Woodward and Ms. Strange had gone to an insurance company on Sheridan. Defendant and Woodward had entered the building through a window. They were looking through an office when Mr. Sullivan came in and surprised them. Woodward pulled out a gun and pointed it at Sullivan. Defendant then took the gun from Woodward and held it on Sullivan while Woodward took his billfold. Defendant then shot Sullivan right above the shoulder blade. Defendant was concerned that Woodward might have left finger-

prints on the window through which they had gained entry into the building. Defendant stated to the witness that the gun he had used was a .22 caliber automatic and belonged to Dennis Woodward.

On cross-examination, the witness admitted making numerous conflicting statements, both in his testimony at the preliminary hearing and in conversations with defense counsel. He further admitted lying to the police when they first contacted him. He testified that one of the reasons he made a statement to the police was because they had a list of burglaries against him.

On re-direct examination he identified State's Exhibit No. 18 as a statement which he had given to the police on June 17, 1975.

Delores Renae Strange testified that she was presently incarcerated in the Tulsa County Jail and was a co-defendant. She stated that on May 14, 1975, at approximately 11:00 p. m., she and Dennis Woodward went to Donald Barnett's house where Woodward and Barnett got into a fight. She, defendant and Dennis Woodward then left Barnett's house and went to the M.F.A. Insurance Building. They had previously discussed committing a burglary; and they told her to park across the street. They got out of the car and defendant told Woodward to get the gun. She subsequently heard a shot and observed defendant run across the street to the car. Defendant stated that he had shot a man. Woodward came down the street, she picked him up and they drove away. Defendant stated that he had shot the man because he did not want to be identified. Woodward had a billfold which contained $48.00, and which they dropped down a drain on Dawson Street.

On cross-examination she denied that she had been promised anything to testify against the defendant; however, she admitted that she did not like the defendant. She further admitted lying to the police when she was first arrested. She gave a statement to the police only after she was informed that she would ". . . only be charged as a material witness [1] and get probation." [Tr. 800]

On re-direct examination she testified that the District Attorney had not promised her anything for her testimony, and that her attorney had advised her to testify.

For the defense, Vicki Jean Walker testified that she was a member of the same general community as Donald Barnett; and, based upon her conversations with other members of the community, she was of the opinion that Barnett was a liar.

Mike Arnold testified that he went to Barnett's house on the evening of May 14, 1975. Defendant was already there when he arrived. Dennis Woodward and Delores Strange came to the house at approximately 10:00 or 10:30 p. m., and Barnett and Woodward got into a fight over Ms. Strange. He and defendant broke up the fight. He did not hear any conversation concerning the commission of a burglary to obtain money. Defendant, Woodward and Ms. Strange left the house together and he left shortly thereafter. Defendant called him at approximately 10:30 p. m. There did not appear to be anything unusual about defendant's voice, and he did not sound upset or scared.

Defendant testified that he did not specifically remember the date of May 14, 1975, but that he did remember an occasion when Woodward and Barnett got into a fight. He arrived at Barnett's house at approximately 3:00 p. m. He stated that Mike Arnold came by later in the evening, after dark, and that Woodward and Ms. Strange came by at approximately 9:30 p. m. Thereafter, Woodward and Barnett got into a fight over Ms. Strange. He and Mike Arnold broke up the fight, after which he went to a friend's house approximately one and a half blocks away. No one was there so he went to King's Pool Hall. The pool hall was closed, therefore, he hitch-

1. Counsel asked the following question: "Q. And then they told you you would only be charged as a material witness and get probation, didn't they? A. Yes." [Tr. 800] This witness was charged with Murder in the First Degree; being a material witness is not a chargeable offense.

hiked to another pool hall. He stayed there for approximately one hour and then hitch-hiked back to Barnett's house. He called Mike Arnold at approximately 11:30 p. m., from Barnett's house, and to his knowledge spent the rest of the night there. He denied any involvement in the murder of Richard E. Sullivan.

On cross-examination, he denied ever telling anyone in jail that he had killed a man.

In rebuttal, Jack Ingram testified that he was serving a sentence in the Tulsa County Jail for taking money under false pretenses. His duties in the jail consisted of feeding the inmates from a food cart. While in the performance of such duties, in the month of August, he overheard the defendant talking to a couple of inmates. Defendant stated that he and two other persons broke into an insurance office in Broken Arrow and that he shot someone there.

On cross-examination, he testified that he was serving a one year sentence and that his charge had been reduced from a felony to a misdemeanor. He admitted approaching his supervisor in the kitchen about getting a "time cut" about a week prior to the trial. He testified that he came forward with the information because of his responsibility as a good citizen.

In surrebuttal, Sol Shore testified that he was a Sergeant in the Sheriff's Department and in charge of the kitchen in the county jail. He stated that in his opinion it was not possible to have overheard a conversation inside the tank where defendant was confined.

Peter Silva, Jr. testified that he was an Assistant Public Defender in Tulsa County and that he had represented Jack Ingram in plea negotiations in the case for which he was presently incarcerated. Ingram contacted him six times over a period of three weeks, extending from the last of August to approximately the third week in September, concerning a "time cut." He advised Ingram that such reductions of sentences could only be obtained by the approval of the District Attorney's Office and the sentencing judge.

■ Defendant asserts, in his first assignment of error, that 21 O.S.Supp.1974, § 701.1 is unconstitutional. This assertion is well taken. In the recent case of *Clark v. State,* Okl.Cr., 558 P.2d 674 (1977), we stated:

"We now deal with the defendants' final assignment of error which alleges the unconstitutionality of 21 O.S.Supp.1974, § 701.1 due to *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). This issue was determined by this Court in *Riggs v. Branch,* Okl.Cr., 554 P.2d 823 (1976). We therein held that the United States Supreme Court's decisions in *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) and *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), left unaffected the validity of the 1973 Oklahoma Statutes defining First Degree Murder. Our conclusion in *Riggs,* supra, was that the Supreme Court's decisions prohibited only the imposition of the death penalty in those cases where the jury had no discretion in the rendering of that sentence. In accordance therewith, we herein modify the sentences from death to sentences of LIFE IMPRISONMENT."

In accordance with *Clark,* supra, we are of the opinion the judgment and sentence should be modified to life imprisonment.

■ The second assignment of error concerns the refusal of the trial court to remand the case to the magistrate for further preliminary hearing. Although couched in terms of the error of the trial court, this proposition is actually directed at error on the part of the magistrate, since if the magistrate had committed no error there would have been no reason to remand.

Title 22 O.S.1971, § 259 provides that any witnesses produced by the defendant at the preliminary hearing must be sworn and examined, and that was done in this case. The defendant called eleven witnesses, but then requested an overnight continuance in order to secure the presence of additional witnesses. He does not contend that the presentation of these extra witnesses would

have led the magistrate to find that the defendant should not be held for trial, but states that the court was denied testimony that would have been material to issues ultimately to be tried to a jury. He alleges that at the time of the hearing certain persons who had been subpoenaed by the defense failed to appear, and that during the course of the hearing the names of other persons were disclosed—persons who the defendant wanted to question on the stand. Accordingly, he moved for a continuance until the next day—it was then 6:40 p. m.; but the magistrate refused to grant the motion and ordered the defendant held for trial. The defendant subsequently moved the district court to remand the case for further preliminary examination, which motion the District Court denied. It is this denial that is assigned here as error.

The alleged error of the magistrate is really a two-fold error: failure to continue the hearing to allow presentation of witnesses already under subpoena, but who did not appear for the preliminary hearing; and failure to continue the hearing to allow the defendant to secure the testimony of additional witnesses whose names were disclosed during the preliminary hearing.

First, in considering the subpoenaed witnesses it is impossible for us to make any determination as to the existence of error because no subpoenaes were included in the record on appeal. It is, therefore, not possible to determine who was subpoenaed, or whether or not the subpoenaes were returned, or if they were returned, what the return stated. We note, however, that the defendant did announce ready without reservation at the preliminary examination, which indicates that he had secured the attendance of all those persons who he wished to have present. The record is devoid of any effort on the part of the defendant to secure the witnesses for trial, or for the hearing on the Motion for New Trial. Moreover, there was neither an offer of proof made by defendant nor any statement in the record by defense counsel concerning what, if any, efforts he made to interview with or talk to the desired wit-

nesses during the three months between the preliminary hearing and the trial before the jury.

Secondly, in considering the witnesses whose names were disclosed during the preliminary hearing, we feel constrained to observe that the preliminary hearing is not a defendant's only opportunity to examine witnesses, and as the magistrate observed in refusing the defendant's requested continuance, the hearing cannot be continued every time a new name is disclosed. In the three month lapse between the preliminary and the trial, these persons also could have been interviewed. Yet, here again, the record is devoid of any indication of defense counsel's effort to find out what the testimony of these additional witnesses would be if they were subpoenaed to testify, or whether he, in fact, subpoenaed any of them for trial or for the hearing on the Motion for New Trial.

Accordingly, we find no record preserved supporting the defendant's allegation of error, nor any evidence of prejudice to the defendant. This assignment of error is without merit.

■ Defendant asserts, in his third assignment of error, that the trial court erred in allowing irrelevant and prejudicial testimony concerning the deceased's civic responsibilities and background. He argues that this testimony was not relevant to any issue and was introduced solely for the purpose of injecting sympathy for the victim. Assuming arguendo that the evidence was improper, we are of the opinion that its exclusion would not have caused the jury to arrive at a different verdict. In *Cottrell v. State,* Okl.Cr., 458 P.2d 328 (1969), we stated:

". . . This Court has stated many times that even if there is error during a trial, this alone is not sufficient to require reversal. The error complained of must injure defendant, and the burden is upon him to establish that he was prejudiced in his substantial rights by the error. See *Harvell v. State,* Okl.Cr., 395 P.2d 331. . . . *Harvell,* . . . has stated the rule as being that a judgment of

**1188**

conviction must be affirmed in the absence of a reason to believe that an intelligent jury would arrive at any other verdict at a second trial due to the exclusion of the erroneous material. . . ."

Applying this rule we are of the opinion that defendant's third assignment of error is without merit.

Defendant asserts, in his fourth assignment of error, that the trial court erred in allowing co-defendant Delores Strange, to testify in behalf of the State. Defendant argues that the witness and the District Attorney's Office were involved in plea negotiations to reduce her charge from Murder in the First Degree provided that she testify against the defendant; and there was not sufficient evidence to justify a reduction of the offense. The defendant does not have standing to assert the rights of Delores Strange, under the provisions of 21 O.S.Supp.1974, § 701.3, and State ex rel. Young v. Warren, Okl.Cr. 536 P.2d 965 (1975). If the witness had, in fact, been denied the above-stated rights, only she, not the defendant, can assert such denial. We, therefore, find this assignment of error to be wholly without merit.

Defendant asserts, in his fifth assignment of error, that the trial court erred in allowing State's Exhibit No. 18, a statement given to the Tulsa Police Department by Donald Barnett, into evidence. We agree with defendant's contention. The statement was introduced during re-direct examination, over objection of the defendant, after the witness admitted during cross-examination that he made numerous conflicting statements to the police, to defense counsel, and at the preliminary hearing. In the early case of Jackson v. State, 12 Okl.Cr. 406, 157 P. 945 (1916), this Court stated:

"Evidence of statements made previous to the trial by a witness consistent with his testimony is not admissible in support of his testimony. . . ." [There are exceptions to this rule which are not applicable to the case at bar.]

Although the statement was inadmissible, we conclude that the minds of an average jury would not have found the State's case significantly less persuasive had the testimony as to Barnett's admission been excluded. See, Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

In his sixth assignment of error, defendant alleges that the trial court committed error in allowing the prosecuting attorney to attempt to define reasonable doubt. The record reflects that the Assistant District Attorney stated, in the final portion of the State's closing argument, as follows:

"You know, this concept of reasonable doubt that Mr. Corley was speaking of, this is not a new concept, he would have you believe that it is, that's not a new concept, that's the same concept, the same reasonable doubt that has been the burden of proof in every criminal case for the last two hundred years. It all boils down to just plain old common sense." [Tr. 902]

These statements were made by the Assistant District Attorney after defense counsel stated, during his closing argument, the following:

"Ladies and gentlemen, under our system of justice, you must find Mike Brown guilty beyond a reasonable doubt. Now, when you think of that concept of reasonable doubt, I like to look at it this way and how much a burden of proof the State of Oklahoma has upon their shoulders. That before any man might be taken to McAlester, I look at it this way; that between here and McAlester, on the road there stands a tree and that tree is known as the tree of reasonable doubt; that before any man may travel the road to the electric chair, that tree of reasonable doubt must be swept clear of the roadway. It is not sufficient that the trunk of the tree is removed from the roadway by the State of Oklahoma, it is essential that every leaf, every branch, every twig of that tree of reasonable doubt is swept clear of the roadway before any man may pass." [Tr. 897–898]

■ It is, thus, readily apparent that the Assistant District Attorney's remarks were made in response to the argument of defense counsel. It has long been the rule of this Court that where improper remarks by a prosecuting attorney are provoked by, and are in reply to, remarks made by defense counsel, the same will not ordinarily be grounds for reversal. See, *Wood v. State,* 4 Okl.Cr. 436, 112 P. 11 (1910); *Davidson v. State,* Okl.Cr. 550 P.2d 955 (1976).

■ Defendant alleges, in his seventh assignment of error, that the prosecuting attorney made remarks during closing argument that were improper and by their very nature were so prejudicial as to have denied him a fair trial. The record reflects that the Assistant District Attorney stated:

"Likewise I submit to you, ladies and gentlemen, that they, the defense counsel, on their voir dire examination, made each of you promise that you would ignore and put aside the fact that there is a rise in the crime rate, not only in Oklahoma, Tulsa County, but throughout the United States, but it came out in the evidence during the course of the trial why there is such a rise in the crime rate, because we have the pack, like existed on the night of the 14th of May, when you don't have money, start hitting the places, start canvassing and find a place to burglarize and if you get caught, do what you can to conceal your identity, even if it means killing.

"By you verdict, ladies and gentlemen, don't you think that it won't have some impact on this criminal element that you see paraded before you today—

"MR. BURNS: Object, Your Honor, and ask that the jury be admonished.

"THE COURT: I believe we have said enough about that, Mr. Hopper." [Tr. 881–882]

We have repeatedly held that only where argument of the prosecuting attorney is grossly improper and unwarranted upon some point which may have affected the defendant's rights can a reversal be had on grounds of improper argument. See, *McMullen v. State,* Okl.Cr., 548 P.2d 652 (1976). We are of the opinion that the remarks of the Assistant District Attorney concerning the rise in the crime rate were questionable; however, we cannot find that the remarks were so grossly improper and unwarranted as to justify reversal.

■ Defendant asserts, as his eighth assignment of error, that the accumulation of errors and irregularities, when considered as a whole, deprived him of a fair and impartial trial. We must disagree. The record reflects that although defendant did not receive a perfect trial, no error occurred which prejudiced the defendant or affected the verdict of the jury. Because of our holding in *Riggs v. Branch,* Okl.Cr., 554 P.2d 823 (1976), and the errors previously discussed, we are of the opinion that justice would best be served by modifying the judgment and sentence from death by electrocution to life imprisonment, and as so MODIFIED, the judgment and sentence is AFFIRMED.

MODIFIED and AFFIRMED.

BLISS and BRETT, JJ., concur.