**Larry Leon CHANEY, Petitioner-Appellant,**

v.

**John N. BROWN, Warden, Oklahoma State Penitentiary, McAlester, Oklahoma, Respondent-Appellee.**

No. 83–1862.

United States Court of Appeals, Tenth Circuit.

March 21, 1984.

Opinion on Denial of Rehearing and Rehearing En Banc May 30, 1984.

Gordon G. Greiner of Holland & Hart, Denver, Colo. (Bruce W. Sattler of Holland & Hart, Denver, Colo., Allen M. Smallwood, Tulsa, Okl., John Charles Boger, NAACP Legal Defense and Educ. Fund, Inc., New York City, of counsel, were also on brief), for petitioner-appellant.

David W. Lee, Asst. Atty. Gen., Oklahoma City, Okl. (Michael C. Turpen, Atty. Gen. of Okl., Oklahoma City, Okl., was also on brief), for respondent-appellee.

Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.

HOLLOWAY, Circuit Judge.

Petitioner Larry Leon Chaney was convicted by a jury of murder in the first degree and the jury recommended a death sentence which was imposed in the District Court of Tulsa County, Oklahoma. Chaney appeals the denial of his petition for a writ

of habeas corpus by the United States District Court for the Northern District of Oklahoma, arguing that (1) the prosecutor wrongfully withheld exculpatory evidence that was material both as to guilt or innocence and to punishment; (2) the prosecutor's withholding of evidence that persons other than Chaney may have been involved deprived Chaney of the opportunity to persuade the jury that he himself did not actually kill the victims, and therefore the death sentence must be vacated in light of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); and (3) the federal district court erred in denying Chaney an evidentiary hearing in connection with his habeas petition.

This case presents for the first time the interplay of three doctrines: (1) a prosecutor's duty to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); (2) a defendant's constitutional right under *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and other cases, to present mitigating evidence before a death sentence is imposed; and (3) the requirement that a defendant kill, attempt or intend to kill, or contemplate that life would be taken, before a death sentence is imposed, consistently with *Enmund*.

We hold that the federal district court improperly ruled that Chaney made only a general pretrial *Brady* request for exculpatory evidence. The court therefore applied the incorrect legal standard under *Agurs* in reasoning that the withheld evidence did not create a reasonable doubt as to Chaney's conviction or sentence. We hold that Chaney made a specific *Brady* request.

Although we conclude that the withheld evidence would not have affected Chaney's murder conviction, we are convinced that this death sentence cannot constitutionally

stand in light of the withholding of the evidence. Under the correct standard applicable where a specific *Brady* request is made, *see Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397, the withheld evidence "might have affected" the choice of the death sentence instead of life imprisonment by its effect on the jury, or at least one of the jurors, who made the aggravating circumstances findings that Chaney himself committed the murder and that these aggravating circumstances were not outweighed by one or more mitigating circumstances.

### *The factual background of the kidnappings and murders*

The evidence presented by the State at Chaney's trial, considered in the light most favorable to the guilty verdict, tended to show the facts as follows:

During March 1977, Phillip Ashmore was engaged in the construction business. He and his wife, Kendal Ashmore, also raised Morgan horses at their farm residence in Jenks, Oklahoma. Kathy Ann Brown worked for the Ashmores in that business.

For approximately one month prior to March 17, 1977, a man who identified himself as Richard Elliot had been calling the Ashmore residence and asking Mrs. Ashmore to give him an estimate of the value of some Morgan horses. On March 12, the man called and made an appointment to come to the Ashmore home the next day. He did not keep the appointment but later called Mrs. Ashmore and explained that he could not find their home. He arranged to meet Mrs. Ashmore at 91st Street and Memorial Avenue in Tulsa, Oklahoma at 1:00 p.m. on March 17. VI R. 875–79; I R. 234.[1]

On March 17, Mrs. Ashmore and Ms. Brown came to Mr. Ashmore's office in Tulsa at 9:30 a.m. to pick up the family's blue and white pickup truck. After returning home at 6:00 p.m., Mr. Ashmore received the first of three extortion calls. The caller indicated that Mr. Ashmore's wife and their employee had been kid-

---

1. The record on appeal consists of ten volumes. Volumes I through III were labeled as such.    We have numbered the remaining volumes in chronological order, beginning with Volume IV.

napped and that they would be returned safely if Mr. Ashmore paid $500,000. The caller said that he would phone again the next night. Mr. Ashmore then called his attorney, who contacted the Federal Bureau of Investigation. The FBI affixed a recording device to the Ashmores' telephone. VI R. 337–54; I R. 236–38.

At 6:53 p.m. on March 18, Mr. Ashmore received a call from a person with the same voice as the caller from the previous night. The caller directed Mr. Ashmore to leave the money at a rodeo ground in Jenks by 7:30 p.m. or his wife would be killed. The caller also told Mr. Ashmore that his truck was at 91st Street and Memorial Avenue in Tulsa. The call was traced to the telephone at Chaney's residence in Jenks. VI R. 361–63, 418–19; I R. 239–41.

After Mr. Ashmore delivered the money to the rodeo ground, he received another call at 9:27 p.m. from a man with the same voice as the man who had telephoned earlier. The caller told Mr. Ashmore that he had not left the money at the right spot and directed that Mr. Ashmore return to the rodeo ground to pick up the money. The caller indicated that he would phone Mr. Ashmore the next day. The call was traced to a service station telephone booth at 61st Street and Yale Avenue in Tulsa. Chaney's palmprint was taken from the receiver handle of the telephone about three hours later. VI R. 365–73, 424–25, 428, 452; I R. 241–42.

The police arrested Chaney at 3:30 a.m. on March 19 at his Jenks home, which was within two miles of the rodeo grounds where the ransom money was to be delivered. Chaney's fingerprints were found on a torn-up piece of paper in a waste basket in his kitchen. When reassembled, the note contained the words "Richard Elloit" [sic], "1:00 p.m.," and "Thursday," and the numbers "299–9791" and "9148." Richard Elliot was the name given by the man who had called about valuing horses and had arranged to meet with Mrs. Ashmore at 1:00 p.m. on March 17 at 91st Street and Memorial Avenue. The numbers matched the Ashmores' home telephone number and

street address. A handwriting expert testified that Chaney made the notations on the torn piece of paper. VI R. 397, 579, 588–89, 1199; I R. 242–43.

The Ashmores' pickup truck had been found at 91st Street and Memorial Avenue at 9 a.m. on March 18, the location the caller indicated in the call at 6:53 p.m. on March 18. A note written on half of a piece of paper in Mrs. Ashmore's handwriting was found in the pickup. The note contained the words "1:00 Thur., 91st and Memorial" and "Richard Eliot," [sic] and the numbers "581–3106" and "352." The other half of the piece of paper was found in the Ashmores' home. VI R. 468–71, 588–89; I R. 238.

The body of Mrs. Ashmore was found on March 22 at 12:45 p.m. in a shallow grave on a tract of land being leased by Chaney near Sallisaw, Oklahoma, approximately 100 miles southeast of Tulsa. Although the size of the tract is not given in the record, it is apparent that it was not small since the witnesses testified that there was a stream or creek in a valley, and that a gravel road ran through the property. VI R. 715–16. Mrs. Ashmore had been strangled with a strip of towel and was found gagged, with her hands tied behind her back. VI R. 719–27; I R. 243. The State's evidence tended to indicate that her death occurred on March 17. Deputy Sheriff Lee of Tulsa County testified that the soil of the grave in which Mrs. Ashmore's body was found, and a heelprint found on the soil, were indicative of rainfall. VI R. 723–24, 735–36; I R. 243. The parties stipulated that the only rain which fell in the Sallisaw area from March 17 through 22 occurred between 7:00 a.m. March 17 and 7:00 a.m. March 18. VI R. 711–12; I R. 243. Dr. Hoffman, the Assistant Chief Medical Examiner for the State, performed an autopsy on March 23. He testified that his findings were consistent with March 17 as the date of Mrs. Ashmore's death. VI R. 832, 854–55, 871; I R. 243.

Two witnesses testified that they observed Chaney on March 17, at 4:30 p.m., walking on his property near the area

where Mrs. Ashmore's body was found. VI R. 671–75, 677, 685–89; I R. 237. Another witness testified that he observed Chaney between 3:00 p.m. and 5:00 p.m. on March 17 using a telephone in a convenience store owned by the witness near Sallisaw. The witness testified that Chaney had dirt stains on his pants from the knees down. VI R. 691–97; I R. 237. Telephone records indicated that a telephone call made from the convenience store at 4:39 p.m. was charged to Chaney's residence. VI 793; I R. 237. The person to whom the call was made confirmed that he received the call from Chaney. VI R. 642–43; I R. 237–38.

Chaney did not take the stand. He called a number of witnesses, including several who testified that he had a nonviolent reputation. VI R. 930, 934, 936. Chaney also called a pathologist who testified that the autopsy protocol was most consistent with March 21 or 22 as the date of death. *Id.* at 1045; I R. 244 n. 3.

The jury found Chaney guilty of murder in the first degree under Okla.Stat.Ann. tit. 21, § 701.7. IV R. 196; VI R. 1235.

A proceeding was then conducted before the same jury to determine the sentence to be imposed. *Id.* tit. 21, §§ 701.9 A,[2] 701.10. The State introduced evidence that Ms. Brown, the horse trainer who worked for the Ashmores, also had been found bound, gagged and strangled in the same grave

where Mrs. Ashmore's body was found. VI R. 1251–63. Chaney's counsel offered mitigating evidence and argued that life imprisonment was the appropriate punishment. He contended that Chaney "did not commit the actual specific act of murder, and for such reason does not deserve the penalty of death." *Id.* at 1264. His closing argument stressed the involvement of at least one other person in the killings. *Id.* at 1274–76. He also introduced a stipulation concerning Chaney's heroic rescue of a man from a burning truck about a month and a half before the kidnappings. *Id.* at 1264–66.

After deliberating for two hours, *id.* at 1288–89, the jury unanimously recommended that Chaney be sentenced to death, and pursuant to Okla.Stat.Ann. tit. 21, § 701.11, found all four of the statutory aggravating circumstances argued by the State to be present. *See infra* note 24. The state trial judge imposed a death sentence. VII R. 2–8. *See also* IV R. 144–46.

On direct appeal, the Oklahoma Court of Criminal Appeals affirmed Chaney's conviction and sentence of death. *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980).[3] The Supreme Court denied certiorari. *Chaney v. Oklahoma,* 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 219 (1981). After two unsuccessful state court applications for post-conviction relief,[4] Chaney petitioned

---

**2.** Section 701.9 A provides that:
> A person who is convicted of or pleads guilty or nolo contendere to murder in the first degree shall be punished by death or by imprisonment for life.

Okla.Stat.Ann. tit. 21, § 701.9 A (West 1983).

**3.** The Court of Criminal Appeals also held that because "the trial court erred in denying the defendant's motion to consolidate and that the prosecution should have consented to the consolidation, ... the state is estopped from prosecuting the remaining murder charge [of Ms. Brown] and the two kidnapping charges." *Chaney v. State,* 612 P.2d 269, 282 (Okl.Cr.1980). The court, however, also held that "if for any reason this case must be remanded for a new trial for the murder of Mrs. Ashmore, the State will no longer be estopped from prosecuting, nor the judge from consolidating, all four cases." *Id.* at 283.

**4.** The District Court of Tulsa County denied Chaney's application for post-conviction relief under Okla.Stat.Ann. tit. 22, § 1080. *Chaney v. State,* No. CRF–77–756 (July 27, 1981), I R. 36–40. The Oklahoma Court of Criminal Appeals affirmed. *Chaney v. State,* No. PC–81–345 (Okla.Cr. Nov. 12, 1981), I R. 42–43. The Supreme Court denied certiorari. *Chaney v. Oklahoma,* 456 U.S. 919, 102 S.Ct. 1778, 72 L.Ed.2d 180 (1982).

The United States District Court for the Northern District of Oklahoma dismissed Chaney's first habeas petition for failure to exhaust state remedies. *Chaney v. Oklahoma,* No. 82–C–625–B (N.D.Okla. June 25, 1982). The District Court of Tulsa County denied Chaney's second application for post-conviction relief. *Chaney v. State,* No. CRF–77–756 (Aug. 9, 1982), I R. 44–53. The Oklahoma Court of Criminal Appeals affirmed. *Chaney v. State,* No. PC–82–487 (Okla.Cr. Feb. 3, 1983), I R. 54–58. The Su-

the United States District Court for the Northern District of Oklahoma for an evidentiary hearing and a writ of habeas corpus. The district court denied Chaney's application for an evidentiary hearing and his petition for the writ. I R. 126–39, 232–323. The court concluded that Chaney's state trial counsel made only a general pretrial request for exculpatory evidence and that, under the due process standard applicable to such general requests, the withheld evidence did not create a reasonable doubt as to Chaney's conviction or death sentence.

This appeal by Chaney challenges the federal district court's denial of an evidentiary hearing and the denial of habeas relief.[5] We issued a stay of execution pending this appeal. *Chaney v. Brown,* 712 F.2d 441 (10th Cir.1983) (per curiam).

As we will discuss in detail, we find the controlling issue in the case to be whether evidence withheld by the prosecution after receiving a *Brady* request might have affected the jury's recommendation of the death penalty. In reaching our conclusion that the death penalty cannot constitutionally stand because the withheld evidence might have affected the jury's determination, we discuss the questions that underlie this conclusion, explaining that: (1) the pretrial request by Chaney for exculpatory or favorable evidence was specific so that under *Agurs* the constitutional test to determine the materiality of the withheld evidence is whether the evidence "might have affected" the verdict of guilt, or the punishment imposed; (2) in determining whether the withholding of evidence denied Chaney due process, the state courts' determinations are not factual findings carrying a presumption of correctness under 28 U.S.C. § 2254(d); this determination is a mixed question of fact and law open to review by the federal courts; (3) considering the record as a whole in connection with the

withheld evidence, we are convinced that the withheld evidence would not have affected the determination of Chaney's guilt; and (4) considering the record as a whole in connection with the nondisclosed evidence, we must hold that the cumulative impact of the withheld evidence might have affected the jury's determination on the death penalty so that this death sentence cannot constitutionally stand.

I

The Supreme Court held in *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), that "the suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The elements of a *Brady* violation are "(a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." *Moore v. Illinois,* 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972).

■ Although "[t]here is no constitutional right to discovery in a criminal case, and *Brady* did not create one," *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977),[6] due process is violated if requested evidence is suppressed "where the evidence is material as to guilt or to punishment." *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197. *See also Agurs,* 427 U.S. at 104 n. 10, 96 S.Ct. at 2398 n. 10; *Moore,* 408 U.S. at 794, 92 S.Ct. at 2568.

■ The question of the materiality of evidence in the prosecutor's control arises in "three quite different situations." *Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397. First, where the prosecutor has knowingly used perjured testimony, the judgment must be set aside "if there is any reasona-

---

preme Court denied certiorari and a stay of Chaney's execution. *Chaney v. Oklahoma,* —— U.S. ——, 103 S.Ct. 2465, 77 L.Ed.2d 1341 (1983).

**5.** The district court certified that there is probable cause for appeal under 28 U.S.C. § 2253. I R. 328.

**6.** *See also Agurs,* 427 U.S. at 106, 96 S.Ct. at 2398; *Moore,* 408 U.S. at 795, 92 S.Ct. at 2568.

ble likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 103–04, 96 S.Ct. at 2397. Second, where defendant has made a specific pretrial request for exculpatory evidence, the judgment must be set aside if "the suppressed evidence *might have affected the outcome of the trial." Id.* at 104, 96 S.Ct. at 2397 (emphasis added); *see id.* at 104–06, 96 S.Ct. at 2397–98. Third, where defendant has made "a general request for *Brady* material," or has made no request at all, the judgment must be set aside "if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2401 (emphasis added); *see id.* at 106–14,. 96 S.Ct. at 2398–02.[7]

## A. *Chaney's Brady request*

■ Chaney filed a motion to produce on April 1, 1977, five months before his trial. I R. 59–62. In the opening paragraph of his motion, Chaney requested essentially all material which might be favorable or exculpatory, affect the determination of his guilt or innocence, or reduce punishment. *Id.* at 59. The motion then specified "that disclosure and production of said material include[s], but [is] not [to] be limited to, the following" material set forth in fifteen paragraphs, including:

> 1. *Statements of all persons who have been interviewed by* an agent of the State of Oklahoma, an investigator or

member of the Tulsa Police Department or the Tulsa County Sheriff's Office or *any other governmental agency in connection with the subject matter of this case,*[8] . . . .

> 2. Stenographic recordings or *transcriptions of any oral statement made by any person to* an agent of the State, an investigator or police officer at the Tulsa Police Department, a member of the Tulsa County Sheriff's Office, or *a member of any other governmental agency in connection with the subject matter of the case,* [9] . . . .

> . . . .

> 4. The names and addresses of all persons who may have some knowledge of the facts involved in the instant case.

> . . . .

> 13. Any and all oral statements made to any member of the Tulsa Police Department or District Attorney's staff or any other law enforcement official.

*Id.* at 59–60 (emphasis added). In response to Chaney's motion, the District Court of Tulsa County ordered that the State produce, among other things (such as Chaney's statements), the following:

> Any and all other evidence now in the custody of the District Attorney's office, the Tulsa Police Department, the Tulsa County Sheriff's office, *the Federal Bureau of Investigation*, the State Crime Bureau for the State of Oklahoma, or

7. *See also Talamante v. Romero,* 620 F.2d 784, 787–89 (10th Cir.), *cert. denied,* 449 U.S. 877, 101 S.Ct. 223, 66 L.Ed.2d 99 (1980); *United States v. Jackson,* 579 F.2d 553, 559 (10th Cir.), *cert. denied,* 439 U.S. 981, 99 S.Ct. 569, 58 L.Ed.2d 652 (1978). For other cases in which we have applied the *Agurs* formula, *see United States v. Montoya,* 716 F.2d 1340, 1346 (10th Cir.1983); *United States v. Behrens,* 689 F.2d 154, 158 (10th Cir.),*cert. denied,*459 U.S. 1088,103 S.Ct. 573, 74 L.Ed.2d 934 (1982); *United States v. Shoels,* 685 F,2d 379, 384 (10th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 3117, 77 L.Ed.2d 1370 (1983); *United States v. Winner,* 641 F.2d 825, 833–34 (10th Cir.1981); *United States v. Alberico,* 604 F.2d 1315, 1318–19 & n. 10 (10th Cir.), *cert. denied,* 444 U.S. 992, 100 S.Ct. 524, 62 L.Ed.2d 422 (1979).

8. Chaney requested these statements:
   whether or not the State intends to call them to testify at trial, and whether or not,

(a) The statement, if in writing, has been signed or approved by the witness.
(b) The statement relates to the proposed subject matter of the witness to be called at trial.
(c) the statement is merely a summary of the facts related to the interviewer.
IV R. 59.

9. Chaney requested these stenographic recordings or transcriptions:
   whether or not,
   (a) the stenographic recordings or transcriptions are a substantially verbatim recital of the statement, or
   (b) the statement was recorded contemporaneously with its making, or
   (c) the statement relates to the proposed subject matter of the testimony of the witness to be used at trial.
   *Id.* at 60.

any other agency of any State or Federal government, which may be favorable to the Defendant or is exculpatory.

IV R. 78–79 (emphasis added).

The state trial court did not expressly decide whether the pretrial *Brady* motion was general or specific. In denying the post-conviction application, however, the court's July 27, 1981 order applied the *Agurs* standard applicable to general *Brady* requests and held that the withheld FBI reports did not create a reasonable doubt as to Chaney's guilt.

In its November 12, 1981 order affirming the denial of post-conviction relief, the Oklahoma Court of Criminal Appeals did not apply the due process standards announced in *Agurs*, and did not discuss whether the request was general or specific. The Court of Criminal Appeals cited only *Brady*, and concluded that the withheld evidence was not material as to guilt or punishment. The court stated that even if the withheld evidence is viewed favorably to Chaney, it "does not tend to exculpate him. Instead it merely tends to suggest that the appellant was not the only person involved in the kidnappings and murders. If a mysterious second person were the one who actually strangled the victims, the appellant must still be considered a principal in the murders." I R. 42.

In the instant habeas proceeding, the federal district court stated that "Petitioner's motion to produce appears to fall in the third category as a general request for *Brady* material." *Id.* at 260.

B. *Characterization of Chaney's Brady request under Agurs*

The Supreme Court discussed the distinction between general and specific *Brady* requests in *Agurs*. The Court stated that a general request "really gives the prosecutor no better notice than if no request is made." 427 U.S. at 106–07, 96 S.Ct. at 2399. As a result, the Court held that for purposes of applying the reasonable doubt test, "there is no significant difference between cases in which there has been merely a general request for exculpatory matter and cases ... in which there has been no request at all." *Id.* at 107, 96 S.Ct. at 2399. In contrast, a specific request gives "the prosecutor notice of exactly what the defense desired." *Id.* [10]

As noted, Chaney's pretrial motion to produce opened with references to material which was favorable or exculpatory as to guilt or punishment, and then pointed to the items requested. Although we discuss the exculpatory nature of the evidence in Parts III and IV, *infra*, we note here that the state trial judge sustained Chaney's motion in part and ordered that the State produce, among other things, evidence in the custody of the District Attorney's office or the FBI "which may be favorable to the Defendant or is exculpatory." IV R. 78–79.

Chaney's pretrial motion to produce included fifteen paragraphs which explained the type of exculpatory evidence requested. Paragraph 1 requested "[s]tatements of all persons who have been interviewed by ... an investigator or member of ... any other governmental agency in connection with the subject matter of this case." I R. 59. Paragraph 2 requested "[s]tenographic recordings or transcriptions of any oral statement made by *any* person to ... a member of any other governmental agency in con-

---

10. The determination of the proper standard to be applied under *Agurs* is not a "factual" finding to which the presumption of correctness of 28 U.S.C. § 2254(d) applies; this presumption does not apply to legal questions or mixed questions of law and fact. *See, e.g., Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983); *Sumner v. Mata,* 455 U.S. 591, 597 & n. 10, 102 S.Ct. 1303, 1307 & n. 10, 71 L.Ed.2d 480 (1982); *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980); *Griffin v. Winans,* 684 F.2d 686, 688–89 (10th Cir.1982); *Hunt v. Oklahoma,* 683 F.2d 1305, 1309 (10th Cir.1982); *United States ex rel Cosey v. Wolff,* 682 F.2d 691, 693 (7th Cir. 1982). Moreover, as noted above, neither the state trial court nor the state Court of Criminal Appeals made any written findings on the character of defendant's *Brady* request and did not expressly rule on, or discuss, whether the request was general or specific. *See* Part II, *infra.*

nection with the subject matter of this case." *Id.* at 59–60. Paragraph 4 requested "[t]he names and addresses of all persons who may have some knowledge of the facts involved in the instant case." *Id.* at 60. Paragraph 13 requested "[a]ny and all oral statements made to any ... law enforcement official." *Id.* at 61.

Here, all four of the withheld FBI reports contain statements made to the FBI by witnesses. Moreover, three of the reports contain the legend "date of transcription." The statements in the four FBI reports thus clearly are covered by Chaney's *Brady* request. His request therefore gave the prosecutor "notice of exactly what the defense desired" under *Agurs.* Indeed, it is difficult to imagine how Chaney could have requested the reports with greater specificity without knowing the identity of three of the witnesses whose statements were included in the FBI reports. The State conceded at oral argument before us that in such a situation "[i]t may not be possible to be more specific" in

formulating a *Brady* request, but contended that "it may be that this kind of request can always be considered general." Transcript of Oral Argument at 27–28. We disagree and hold that the request is specific because it gave the prosecutor "notice of exactly what the defense required" under *Agurs,* and because it was formulated in terms as specific as possible in the circumstances.

Our holding that Chaney made a specific *Brady* request is supported by *Agurs* and other decisions. The Court in *Agurs* explained that general requests merely ask for "all *Brady* material" or for "anything exculpatory." 427 U.S. at 106–07, 96 S.Ct. at 2399. Chaney's request is more specific than *Brady* requests that courts have held to be general. For example, the Ninth Circuit recently held that a request for "all evidence known to the State which may prove the defendant's innocence" constitutes a general request. *Hilliard v. Spalding,* 719 F.2d 1443, 1445 (9th Cir. 1983).[11]

---

**11.** Other examples of general *Brady* requests include requests for "all information and evidence which would tend to exculpate the guilt of the defendant or mitigate the degree of the evidence or reduce the punishment," *United States v. Cody,* 722 F.2d 1052, 1062 n. 1 (2d Cir.1983) (Second Circuit held that this request, taken either separately or together with request for documentary evidence with respect to any informant or accomplice that Government intended to call at trial, was not a specific request in connection with alleged verbal threats against Government witness); "detailed boiler plate requests for any and all exculpatory evidence," *United States v. Martorano,* 663 F.2d 1113, 1114 (1st Cir.), *cert. denied,* — U.S. —, 103 S.Ct. 1249–50, 75 L.Ed.2d 479 (1982); requests for "all statements and any other evidence contained in police report[s] or County Attorney's files or Sheriff's files which are exculpatory in nature," *Scurr v. Niccum,* 620 F.2d 186, 188 (8th Cir.1980) (Eighth Circuit held that "we agree with the state that the language of the defense request is too broad, by itself, to constitute a specific request." *Id.* at 190.); requests for "all material known by the government ... which is exculpatory in nature or favorable to the defendant, or may lead to the discovery of exculpatory material or material which may be used to impeach prosecution witnesses," *United States v. DiCarlo,* 575 F.2d 952, 959 (1st Cir.), *cert. denied,* 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 (1978) (First Circuit termed this "a

classic example of a non-specific request as defined in *Agurs.*" 575 F.2d at 959 (referring to *Brady* request in *United States v. McCrane,* 527 F.2d 906, 910 (3d Cir.1975), *vacated,* 427 U.S. 909, 96 S.Ct. 3197, 49 L.Ed.2d 1202 (for reconsideration in light of *Agurs*), *aff'd,* 547 F.2d 204 (3d Cir.1976)). On reconsideration, the Third Circuit treated the request as specific because the Government had conceded that it was specific. *United States v. McCrane,* 547 F.2d 204, 208 (3d Cir.1976).).

Additional examples of general requests include requests for "any other material in the possession of the Government bearing adversely on the credibility, character and reputation of [a particular Government witness]; and ... any other material relating to any matter which defense counsel could properly use in the possession of the Government bearing adversely on the credibility, character and reputation of (a particular Government witness); and ... any other material relating to any matter which defense counsel could properly use in cross-examination to inquire into [the witness's] motive and bias in favor of the Government or expectation of favor from the Government," *Ostrer v. United States,* 577 F.2d 782, 786 (2d Cir.1978) (Second Circuit held that "[t]his request amounted to nothing more than a boilerplate" general *Brady* request.), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979); requests for "[a]ll books, papers, documents, photographs, tangible objects, buildings or places in

Courts have held that *Brady* requests analogous to Chaney's motion constitute specific requests. For example, in *Agurs* the Court explained that the request in *Brady* "to allow [defendant] to examine [his named accomplice's] extrajudicial statements," 373 U.S. at 84, 83 S.Ct. at 1195, was a specific request. 427 U.S. at 104, 96 S.Ct. at 2397.[12] Moreover, other courts have stated that the *Agurs* standard

the control or possession of the Government which are material to the defense or intended for use by the Government in its case in chief or any such items obtained from the Defendant," *United States v. Anderson,* 574 F.2d 1347, 1351, 1352–56 (5th Cir.1978).

Further examples of general requests include requests for "[i]nformation relating to material inconsistencies between statements given by any person, whether or not he is a prospective Government witness, and information relating to material inconsistencies between two or more persons, whether or not they are prospective government witnesses," *United States v. MacKey,* 571 F.2d 376, 388–89 (7th Cir.1978); requests for "all evidence favorable to [defendant] under the authority of *Brady,* including all information regarding police records, arrests, convictions, and any deals, promises or communications with Government witnesses regarding benefits they may receive, or have already received, for testifying against defendant," *United States v. Lasky,* 548 F.2d 835, 839 & n. 2 (9th Cir.), *cert. denied,* 434 U.S. 821, 98 S.Ct. 63, 54 L.Ed.2d 77 (1977) [citation omitted] (Ninth Circuit treated this as a general request for "all *Brady* and *Giglio* material." 548 F.2d at 839 & n. 2. *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (due process requires new trial when evidence discovered that Government failed to disclose alleged promise of leniency made to its key witness in exchange for his testimony)); and requests for "[a]ny and all other records and/or information which arguably could be helpful or useful to the defense in impeaching or otherwise detracting from the probative force of the plaintiff's evidence or which arguably could lead to such records of [sic] information." *United States v. Boffa,* 513 F.Supp. 444, 501 (D.Del.1980). *See also United States v. Mangieri,* 694 F.2d 1270, 1288 (D.C.Cir.1982) (When only evidence of *Brady* request was prosecutor's statement that "[w]e have an understanding, of course, that in the event that other [exculpatory] documents turn up ... I will turn them over," court held that this is, "at best, a general request.").

**12.** We have held that when a defendant "ask[s] the prosecutors whether [a Government rebuttal witness] had been offered immunity," this constitutes a specific request. *United States v. Montoya,* 716 F.2d 1345–46 (10th Cir.1983). Other courts have held that the following requests constitute specific requests: "general request[s] for 'all exculpatory evidence' [that specifies] that it included 'all information available concerning the past and present mental condition of [a specific witness],' " *King v. Ponte,* 717 F.2d 635, 639–40 (1st Cir.1983); requests for

" 'full and complete statement[s] of all promises, rewards, and/or inducements of any kind made by the government ... to induce or encourage the giving of testimony or information and made to ... any prospective witness whom the Government intends to call at the trial ...' and for '[a]ny evidence which may be used to impeach or discredit any witness the government intends to call at the trial ..., particularly, but not exclusively, inconsistent statements of a witness or between witnesses,' " *United States v. Flaherty,* 668 F.2d 566, 587 (1st Cir.1981); requests for "information on the victim's criminal record, including his FBI rap sheet," *Briggs v. Raines,* 652 F.2d 862, 863, 865 (9th Cir.1981); and requests "for the rap sheet of the deceased," *Martinez v. Wainwright,* 621 F.2d 184, 185 n. 1 (5th Cir.1980).

In addition, the Eighth Circuit held that the following coloquy between court and counsel at a hearing on defendant's motion to produce transformed a general request for "all statements and any other evidence contained in police report[s] or County Attorney's files or Sheriff's files which are exculpatory in nature" into a specific request:

THE COURT: I assume anything exculpatory will include any evidence you might have had that someone clsc had done it. In other words, it might be anything that tends to be exculpatory as to this Defendant is, I assume, what they have in mind.

[DEFENSE COUNSEL]: This was intended by the defendant when he filed this, including any statements that were furnished by [defendant's accomplice] here, or police reports that involved the obtaining of this information from [the accomplice].

THE COURT: * * * I assume that that includes oral as well as any written statements.

[DEFENSE COUNSEL]: It was intended to include both, sir. 27

*Scurr v. Niccum,* 620 F.2d 186, 188, 190 (8th Cir.1980). The Eighth Circuit explained that:

[A] request for disclosure of particular information cannot be labeled as either "specific" or general in a vacuum. Rather, the question must be asked whether, under all the circumstances presented by the case, the request was such as to give the prosecution reasonable notice of what the defense desired. In other words, "specificity" is a function of several factors, including the literal language of the defense request itself, the apparent exculpatory character of the evidence sought, and the reasonableness of the explanation, if any, for which the evidence was not exposed or was not considered to be material by the prosecution.

applied to specific requests should be used when there is uncertainty concerning the characterization of a request. *See United States ex rel. Marzeno v. Gengler*, 574 F.2d 730, 736 (3d Cir.1978) (*cited in King v. Ponte*, 717 F.2d 635, 640 (1st Cir.1983)). We feel this rule is especially appropriate in a death penalty case.

*United States v. Gaston*, 608 F.2d 607 (5th Cir.1979), supports our holding that Chaney made a specific pretrial *Brady* request. In *Gaston*, the defendant at trial,[13] during a bench conference and subsequent recess, "requested any prior statements of witnesses who had testified, *including any interview reports prepared by the FBI agents who investigated the case* on FD–302 forms (commonly called 302s), to which he might be entitled under the Jencks Act, 18 U.S.C. § 3500,[14] or under *Brady*." 608 F.2d at 610 (emphasis added). The Fifth Circuit held that this is "not a blanket request ... but rather is a request for specific documents." *Id.* at 613. Chaney here similarly requested FBI interview reports; however, in contrast to the situation in *Gaston*, Chaney's counsel could not limit his request to specific witnesses because the request was made prior to trial and Chaney's counsel did not then know the

*Id.* at 190.

13. In *United States v. Montoya*, 716 F.2d 1340, 1346 n. 5 (10th Cir.1983), we observed that "[i]n *Agurs*, the request for information came before trial. We see no reason why [a] request made during trial ... should be treated differently."

14. The Jencks Act, which codifies the holding in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), requires production, upon motion of the defendant, of any statement within the scope of the subject matter of the direct examination of a government witness who has testified. 18 U.S.C. § 3500(b).

15. To the extent that *United States ex rel Moore v. Brierton*, 560 F.2d 288 (7th Cir.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1285, 55 I..Ed.2d 794 (1978), is inconsistent with our holding that Chaney made a specific *Brady* request, we choose not to follow it. In *Moore*, "the defense requested written statements in the possession of the prosecution, the [city] police chief, or the [city] superintendent of police taken from any witnesses subsequent to the murder." *Id.* at 292. The Seventh Circuit held that the request

identity of three of the witnesses interviewed by the FBI.

We are convinced that the pretrial request for favorable or exculpatory investigative interview reports gave the prosecutor "notice of exactly what the defense desired," and therefore was a specific request under *Agurs*.[15] The request by motion also must be considered in conjunction with the state trial court's production order, which specified any and all evidence in the custody of the District Attorney's office or the FBI "which may be favorable to the Defendant, or is exculpatory." IV R. 78–79. We hold that Chaney's request is within the parameters of a specific request under the Supreme Court's standards set forth in *Agurs*.

II

We now turn to the contention by the State that the question of the materiality and possible effect of the withheld evidence on the verdicts has been decided by the state courts and that we must presume those determinations to be correct as factual findings under 28 U.S.C. § 2254(d).[16] Brief of Appellee at 14.[17] We must disagree.

"was not specific in our opinion. Instead, it was a request for exculpatory material which should be scrutinized in accordance with the reasonable doubt standard [applicable to general requests] set forth in *Agurs*." *Id.* We are convinced for the reasons discussed above, despite the Seventh Circuit's characterization of the request in *Moore*, that Chaney here made a specific *Brady* request.

16. Section 2254(d), in pertinent part, provides that in a federal habeas proceeding, "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction ... shall be presumed to be correct," unless any of eight exceptions applies. 28 U.S.C. § 2254(d).

17. In the instant habeas suit, the federal district court at pages 29–30 of its opinion stated that a federal court must give state court findings a presumption of correctness pursuant to § 2254(d); it then quoted the state trial judge's statement that the withheld evidence "would not have altered the demonstration of petitioner's guilt beyond a reasonable doubt ..." The fed-

■ The state courts did not make an actual determination on one question which is critical under *Brady* and *Agurs*, and which we find controlling here—whether the withheld evidence might have affected the jury's imposition of the death penalty. The state trial court held that the FBI reports "would not have affected the demonstration of [Chaney's] guilt beyond a reasonable doubt at the trial," without discussing the selection of the death penalty. I R. 40. The Oklahoma Court of Criminal Appeals affirmed, and its reasoning in full was stated as follows:

> Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the fact that the prosecutor was acting in good faith in failing to disclose evidence is irrelevant. What matters is whether the evidence is material to guilt or punishment. After examining the exhibits provided by the appellant and the transcript of the post-conviction hearing held in the district court, this Court concludes that the evidence raised was not material.
>
> Even if the appellant's evidence was viewed in the light most favorable to him, *it does not tend to exculpate him. Instead, it merely tends to suggest that the appellant was not the only person involved in the kidnappings and murders. If a mysterious second person were the one who actually strangled the victims, the appellant must still be considered a principal in the murders.*
>
> IT IS THEREFORE THE ORDER OF THIS COURT that the order of the district court denying post conviction relief should be, and same hereby is, affirmed.

*Id.* at 42–43 (emphasis added). Although the court mentioned materiality as to "guilt or punishment," the court's obvious concern was with exculpation from *guilt.* The court's reasoning and statement that Chaney in any event was a "principal" ignore the effect of the withheld evidence as mitigating evidence which could have affected the imposition of the death penalty.

The Supreme Court has expressly held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt *or to punishment.*" *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (emphasis added). *See also United States v. Valenzuela-Bernal,* 458 U.S. 858, 868, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193 (1982); *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982); *United States v. Agurs,* 427 U.S. 97, 104 n. 10, 96 S.Ct. 2392, 2398 n. 10, 49 L.Ed.2d 342 (1976); *Moore v. Illinois,* 408 U.S. 786, 794, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972); *United States v. Muse,* 708 F.2d 513, 516 (10th Cir.1983); *United States v. Winner,* 641 F.2d 825, 833 (10th Cir.1981); *Talamante v. Romero,* 620 F.2d 784, 787 (10th Cir.), *cert. denied,* 449 U.S. 877, 101 S.Ct. 223, 66 L.Ed.2d 99 (1980); *Calley v. Callaway,* 519 F.2d 184, 221 (5th Cir.1975) (en banc) ("*Brady* requires the disclosure of material evidence *favorable in the sense of mitigation* or exculpation . . . .") (emphasis added), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976); 3 C. Wright, *Federal Practice and Procedure* § 557.2, at 355–56 (2d ed. 1982) ("Evidence may be favorable to the defense, and within the duty to disclose, whether it relates to guilt or to punishment.").

Careful study of the state courts' findings and opinions with "adequate written indicia" demonstrates that there was no actual discussion by the state courts on the issue whether the withheld evidence "might have affected" the imposition of the death penalty. In any event, on this critical issue there are no factual findings "on basic, primary or historical facts" bearing a presumption of correctness under § 2254(d). *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980).

■ Moreover, the determination under *Agurs* whether the withholding of the

eral judge concluded that the state trial judge's findings are adequately supported by the record

and that Chaney has failed to show that his conclusions were erroneous.

evidence might have affected the verdicts so as to infringe due process rights is not a factual finding to which § 2254(d) applies. As the Fifth Circuit explained in *Davis v. Heyd*, 479 F.2d 446, 451 (5th Cir.1973):

> The question of materiality present in cases in which the accused complains of prosecutorial suppression of material evidence is .... [a] mixed question[ ] of law and fact calling ultimately for a legal determination .... and therefore [is] not entitled to a § 2254(d) presumption of validity.

*Id.* at 451. *See also Ruiz v. Cady*, 635 F.2d 584, 588–89 (7th Cir.1980). The § 2254(d) presumption of correctness does not apply to legal questions or mixed questions of law and fact such as whether the nondisclosure of evidence here might have affected the guilt or punishment decisions and thus infringed Chaney's due process rights; the presumption applies only to "basic, primary or historical facts." *Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). *See also Marshall v. Lonberger*, 459 U.S. 422, 431, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983); *Sumner v. Mata*, 455 U.S. 591, 597 & n. 10, 102 S.Ct. 1303, 1307 & n. 10, 71 L.Ed.2d 480 (1982); *Griffin v. Winans*, 684 F.2d 686, 688–89 (10th Cir.1982); *Hunt v. Oklahoma*, 683 F.2d 1305, 1309 (10th Cir. 1982).[18]

In sum, we hold that the issue whether the withheld evidence "might have affected" the guilt and punishment determinations so that due process was denied is an issue open for federal court review; the issue has not been decided by the state courts with findings entitled to a presumption of correctness.

### III

■ We consider now whether the withheld evidence, viewed as a whole, might have affected Chaney's conviction. We consider in Part IV, *infra*, whether that evidence might have affected the death sentence determination by the jury.

### A. *The withheld evidence*

In March 1981, pursuant to a request under the Freedom of Information Act (FOIA) by a Tulsa newspaper, three FBI reports were released. They contained statements made to the FBI during its initial investigation which was conducted within two weeks after the kidnappings. The FBI reports detailed statements of these interviews with Ms. Poppy Weaver,

---

18. *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), relied on by the State, does not require a contrary conclusion. There, a state court denied a motion to vacate a defendant's conviction on the ground that the prosecution did not disclose evidence that a juror during the trial had applied for employment with the district attorney's office. The state court concluded "beyond a reasonable doubt" that these facts did not influence the verdict. The federal district court issued a writ of habeas corpus on the ground that defendant was the victim of implied bias. 485 F.Supp. 1365, 1371–72 (S.D.N.Y.1980). The Second Circuit affirmed, but did not discuss whether the defendant was the victim of actual or implied bias. 632 F.2d 1019, 1022 (2d Cir.1980). Instead, the Second Circuit held that "the failure of the prosecutors to disclose the knowledge denied [defendant] due process." *Id.* at 1022. The Supreme Court reversed. After discussing *Brady* and *Agurs*, the Court held that prosecutorial misconduct alone does not require a new trial. 455 U.S. at 219–20, 102 S.Ct. at 947. The Court held that defendant was not denied a fair trial because the state court had found that the juror's conduct "did not impair his ability to render an impartial verdict." Id. at 220, 102 S.Ct. at 947. The Court previously had stated that these state court findings were presumptively correct under § 2254(d). *Id.* at 218, 102 S.Ct. at 946.

The Court in *Smith v. Phillips* did not hold that the § 2254(d) presumption of correctness applied to determinations of the materiality of withheld evidence under *Agurs*. Instead, the Court applied the § 2254(d) presumption of correctness to the discrete factual determination that the juror's applying for a job with the district attorney's office during the course of defendant's trial did not reflect "a premature conclusion as to the [defendant's] guilt, or prejudice against the [defendant], as an inability to consider the guilt or innocence of the [defendant] solely on the èvidence." 455 U.S. at 213–14, 102 S.Ct. at 944; *People v. Phillips*, 87 Misc.2d 613, 627, 834 N.Y.S.2d 906, 915 (1975).

This finding in *Smith v. Phillips* fits within the category of "basic, primary or historical facts" entitled to the § 2254(d) presumption. In the instant case, however, the due process issue is clearly a mixed question of fact and law.

J.C. Hamilton and Kyle West very shortly after the critical events of March 17, 1977. In addition, among other FBI reports released in the fall of 1982 pursuant to a federal court order, there was a statement by Phillip Ashmore.

One of the withheld FBI reports released in March 1981 contains a transcription of a statement made to the FBI by Ms. Weaver on March 22, 1977, five days after the kidnappings. She said that she saw Mrs. Ashmore at 4:10 p.m. on March 17, 1977, in the Ashmores' blue and white pickup truck with an unidentified man and woman at a grocery store in Jenks, Oklahoma. Ms. Weaver glanced at the parked Ashmore truck, which was some 8 or 9 parking spaces away, with no other vehicles parked between her car and the Ashmores' truck. She saw Mrs. Ashmore under the steering wheel. After she recognized Mrs. Ashmore, Ms. Weaver went in the store and the Ashmores' truck was gone when she came out about 10 minutes later. Jenks is a small community two or three miles south of Tulsa.

Ms. Weaver said that she lived near the Ashmores; that she was acquainted with Mrs. Ashmore and saw her frequently; and that she was familiar with the Ashmores' truck, which she knew the Ashmores drove. Ms. Weaver also stated that she was certain of the time because she had picked up her son at school at 4:00 p.m. and had driven straight to the store. She said that two firetrucks and two police cars with sirens went by while she was in the store's parking lot. I R. 69–70. As noted below, a stipulation was made at a post-conviction hearing that the Jenks fire department answered a call at 4:08 p.m. on March 17 and that the likely route of the fire truck would have taken it by the grocery store mentioned.

The second withheld FBI report contains a transcription of a statement made to the FBI by J.C. Hamilton on March 18, 1977,

the day after the kidnappings. He made daily trips to pasture rented at 91st Street and Memorial Avenue to tend to his stock. He said that he saw a pickup truck arrive at 91st Street and Memorial Avenue between 8:00 a.m. and 8:30 a.m. on March 18. Hamilton stated that he was positive of the time. He saw the driver of the truck at a distance of about 50 yards and described him as a white male, about 6 feet in height, neither real old nor young, and of slender build. He said that the driver of the truck "passed in front of the parked truck and walked over to a car that was waiting for him." He added that he "did not know if there was another individual in the black car but presumed there was but could not give a description." I R. 65–66. Hamilton said that the parked truck was the one still there at the time of the interview with the FBI agent (which turned out to be the Ashmore truck).

The third withheld FBI report contains a summary of a statement made to the FBI by Kyle West,[19] a Jenks public school student. He stated that between 4:00 p.m. and 4:30 p.m. on March 17, 1977, and again at 5:30 p.m., at 91st Street and Memorial Avenue he saw a "shiny red" pickup truck with a white stripe across it and a 'clip-on' CB antenna on the driver's side. West stated that "this truck was parked on the south side of the Bixby Produce Building, next to it, with the nose of the truck facing west." I R. 67.

The FBI report released during the fall of 1982 contains a transcription of a statement made to the FBI by Phillip Ashmore on March 17 on the events that day. *Id.* at 71–72. He reconstructed the telephone conversation he had with the caller at 6:30 p.m., recalling that the caller said:

> You listen to me and you listen good. I've got your wife and that Honky that works for you. If your children want to see their mother again, you go down to

---

**19.** Unlike the FBI report containing the Weaver, Hamilton and Ashmore statements, the record containing West's statement does not indicate the date on which West was interviewed. We note, however, that West was interviewed during the course of the FBI's initial investigation from March 17 to April 1; the statement thus was given to the FBI sometime within two weeks after the kidnappings.

the bank and get a half a million dollars in one hundred dollar bills and put it in a canvas sack. *There are four of us. We're* not kidding. If your wife tries anything like that Honky that works for you, *we'll* do her the same way.

*Id.* at 72 (emphasis added).

### B. *The prior proceedings concerning the withheld evidence*

On April 3, 1981, before the release of the FBI report containing the transcription of Mr. Ashmore's statement, Chaney filed his application for post-conviction relief under Okla.Stat.Ann. tit. 22, § 1080, in the District Court of Tulsa County. He alleged, *inter alia,* that the withholding of the FBI reports containing transcriptions of the statements by Weaver, Hamilton and West required that his conviction and sentence be vacated. Chaney's counsel contended that he had made a specific pretrial *Brady* request, while the State argued that the request was merely general. IX R. 4, 5.

The state court conducted a hearing on the application on May 1. Chaney's attorney introduced the three FBI reports in evidence, IX R. 37, and called one witness, Mr. Fallis, the Tulsa County District Attorney, to testify. Chaney's attorney stated that he had spoken to Weaver and Hamilton and to West's mother and that he had decided not to call Weaver, Hamilton or West to testify. IX R. 38; II R. 6–7.

The state prosecutor testified that he did not give Chaney's counsel the FBI reports because he did not consider them to be exculpatory. Mr. Fallis said that Ms. Weaver's statement (among other things that Mrs. Ashmore was in the parked Ashmores' blue and white pickup truck with an unidentified man and woman in Jenks at 4:10 p.m. on March 17) was not exculpatory because Ms. Weaver had subsequently said she could not identify Mrs. Ashmore as a person in the truck:

it is my recollection, she could not with certainty identify this person as being Mrs. Ashmore. As a precaution, based upon having received your notification in this case, she was talked to again by an investigator from my office. Her response was, "I couldn't identify the woman now, I can't identify her now." So, again, I find nothing in those reports that is exculpatory.

IX R. 25; *see also id.* at 26–28, 33–34.

Mr. Fallis testified that the Hamilton statement (that a pickup truck arrived at 91st Street and Memorial Avenue between 8:00 a.m. to 8:30 a.m. on March 18) was not exculpatory because the truck had been discovered thirty minutes to an hour earlier. Mr. Fallis said that the man Hamilton saw emerge from the truck was an employee of Mr. Ashmore. *Id.* at 24. Mr. Fallis said that the West statement (that a red pickup truck was parked at 91st Street and Memorial Avenue between 4:00 p.m. and 5:30 p.m. on March 17) was not exculpatory because a red pickup truck "has totally no relationship to the case," explaining that the Ashmore pickup truck was blue and white. *Id.* at 25.

Chaney's counsel argued that the Hamilton and West statements contradicted the State's evidence that the Ashmore pickup truck was abandoned at 91st Street and Memorial Avenue on March 17 before 5:00 p.m. to 6:00 p.m. With regard to the exculpatory nature of Ms. Weaver's statement, he stated that:

I think the most substantial piece of evidence is obviously contained in [the FBI report of Weaver's statement], which placed Kendall Ashmore in Jenks, Oklahoma at 4:10 in the afternoon of March 17, 1977, 110 miles away, and only an half hour's time away from [Chaney] unquestionably making a long distance telephone call from Sequoyah, Oklahoma. He certainly cannot be in two places at one time.... I don't care who it was [in the truck with Mrs. Ashmore]. Based on the State's own theory of the case, it could not have been [Chaney].

In my opinion, it is extremely exculpatory as to the guilt or the mitigation [of] punishment. *It could indicate another individual would have had to be involved. More than likely, another indi-*

*vidual actually killed Kendall Ashmore and Kathy Brown.*

*Id.* at 43–44 (emphasis added).

In addition to introducing the FBI reports in evidence at the post-conviction hearing, a stipulation was made and offered that the Jenks fire department responded to a call at 4:08 p.m. on March 17, 1977, and that the fire trucks likely took a route past the grocery store where Ms. Weaver stated in the FBI report that she saw Mrs. Ashmore. IX R. 38–40. This stipulation corroborates Ms. Weaver's statement to the FBI agent that while in the grocery store parking lot at 4:10 p.m. she "recalled [that] two firetrucks and two police cars with sirens went by." I R. 70.

The state trial judge announced at the May 1981 hearing that he would deny Chaney's application. He stated that "this is one of the strongest cases that I've ever seen as a trial judge as far as evidence against the Defendant is concerned." IX R. 53.

Chaney's counsel sought to reopen his application for post-conviction relief to introduce further evidence. At a July 1981 hearing, he argued that the FBI reports called Chaney's guilt into question, or at least might have mitigated his punishment. Chaney's counsel also emphasized that since the earlier hearing he had been given the names of the FBI agents who had interviewed the witnesses discussed in the FBI reports. Chaney's attorney sought to subpoena FBI Agent McLain, who had taken Ms. Weaver's statement. Chaney's counsel stated that he had spoken with Agent McLain, who indicated that "he was absolutely and certainly positive that the written reduction of the oral statement made to him by Poppy Weaver was a true and accurate transmission of what had been said to him." X R. 4. The court denied Chaney's application to reopen the proceedings.

In its order denying Chaney's post-conviction application, the state trial court did not say whether Chaney had made a general or specific request for *Brady* material. As noted in Part II, *supra,* however, the court applied the *Agurs* standard applicable to general *Brady* requests and held that the FBI reports "would not have altered the demonstration of [defendant's] guilt beyond a reasonable doubt at trial." I R. 40.

The Oklahoma Court of Criminal Appeals affirmed and, without discussing *Agurs,* held that "the evidence raised was not material." As noted in Part II, *supra,* the appellate court's reasoning also focused on the effect of the withheld evidence on Chaney's conviction.

### C. *The effect on the conviction*

The jury found Chaney guilty of murder in the first degree under Okla.Stat.Ann. tit. 21, § 701.7. IV R. 196; VI R. 1235. Section 701.7 A provides that "[a] person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof." Okla.Stat.Ann. tit. 21, § 701.7 A (West 1983).[20] Section 701.7 B provides that "[a] person also commits the crime of murder in the first degree when he takes the life of a human being, regardless of malice, in the commission of [specific enumerated felonies, including] kidnapping." *Id.* tit. 21, § 701.7 B. We noted in *Sanders/Miller v. Logan,* 710 F.2d 645, 651 (10th Cir.1983), that § 701.7 B is a "felony-murder section which permits a conviction of first degree murder punishable by death or life imprisonment, regardless of malice, when a life is taken during the commission of specific enumerated felonies."

---

20. Oklahoma law defines homicide as "the killing of one human being by another." Okla.Stat. Ann. tit. 21, § 691 (West 1983). Oklahoma law classifies homicides into four categories: murder, manslaughter, excusable homicide and justifiable homicide. *Id.* tit. 21, § 692. Section 693 provides that "[n]o person can be convicted of murder ... unless the death of the person alleged to have been killed and the fact of the killing by the accused are each established as independent facts beyond a reasonable doubt." *Id.* tit. 21, § 693.

Chaney's counsel argues that the withheld evidence might have affected his conviction in light of *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). We disagree. In *Enmund*, the Court held that the death penalty was unconstitutionally imposed "in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken." 458 U.S. at 801, 102 S.Ct. at 3379. *Enmund* does not bar a conviction for murder, absent such proof. The possible involvement of others in the kidnappings and murders does not call Chaney's conviction for Mrs. Ashmore's murder into question under *Enmund*. We agree with the Fifth Circuit, which recently held that "*Enmund* merely invalidates a death penalty when based solely upon a defendant's criminal responsibility for a killing by an accomplice that is unintended or not contemplated by the defendant; it does not invalidate a conviction of a substantive offense of murder when guilt is so based." *Skillern v. Estelle*, 720 F.2d 839, 846 (5th Cir.1983).

We are convinced that the withheld evidence would not have affected Chaney's conviction. As to guilt, the state trial judge called this "one of the strongest cases against a criminal defendant that the Court has witnessed as a trial judge." I R. 39. The nondisclosed evidence supports an inference that others were involved in the kidnappings and murders, and that Chaney himself did not commit the murders and was not present at that time. However, we are satisfied that the withheld evidence would not have affected a conclusion that Chaney was involved in the felony of kidnapping during which the murder of Mrs. Ashmore was committed.[21]

Section 701.7 B does provide that one is guilty of felony murder "if *he* takes the life of a human being, regardless of malice" during the commission of the named felonies, including kidnapping. Okla.Stat.Ann. tit. 21, § 701.7 B (West 1983) (emphasis added). Nevertheless, the state trial court at the first stage instructed the jury on the responsibility of an aider and abettor as a principal under Okla.Stat.Ann. tit. 21, § 172. IV R. 156 ("all persons concerned in the commission of crime ... whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals"). The court also instructed on the felony murder rule as follows: "[T]he State is not required to prove that the homicide was committed with a deliberate intention, a premeditated design, on the part of the defendant, to kill the deceased. A homicide, although unintended, if committed in the commission of kidnapping constitutes murder in the first degree." IV R. 159. Considering the theory of responsibility under the aider and abettor statute, together with the Oklahoma felony murder statute, the conviction of Chaney for first degree murder is supported by Oklahoma law and by the strong circumstantial evidence showing Chaney's participation at least as an aider and abettor in the kidnapping, during which Mrs. Ashmore's murder oc-

**21.** As detailed earlier, the circumstantial evidence implicating Chaney in the kidnappings during which the murders occurred includes the following: the second extortion call was traced to Chaney's residence in Jenks; the third extortion call was traced to a public telephone in Tulsa from which Chaney's palmprint was lifted; the voice of the caller in all three calls was said by Mr. Ashmore to have been the same; a note in Chaney's handwriting found in his residence contained the words "Richard Elloit" [sic] (the name given by a caller who had arranged to meet the victim about valuing some Morgan horses at 1:00 p.m. on Thursday, March 17), "1:00 p.m." and "Thursday" (the time and day of the scheduled meeting), "299–9791" (the Ashmores' home telephone number), and "9148"

(the street number of the Ashmores' residence); the bodies were found on the tract of land leased by Chaney; a pick-ax found at Chaney's residence contained soil particles consistent with the soil at the gravesite; three terrycloth bath towels were missing from the Sallisaw Motel where Chaney stayed the evening of March 16 (the victims had been bound, gagged and strangled with strips of terrycloth or towel).

Thus the circumstantial evidence of Chaney's involvement in the kidnappings is strong, despite the conflicting inferences and doubts raised by the withheld evidence as to Chaney's being the sole participant in the criminal episode and as to his taking part in the actual murders, or his being present when the murders were committed.

curred.[22] *See Hatch v. State,* 662 P.2d 1377, 1381–82 (Okl.Cr.1983).

We conclude that the withheld evidence would not have affected a determination that Chaney at least was involved by aiding and abetting the kidnapping of Mrs. Ashmore, and liable as a principal for her murder during that felony, even if he did not commit the murder or intend that it occur. Thus, we find no constitutional infirmity in the conviction itself.

## IV

Lastly, we reach the critical question whether the withheld evidence "might have affected" the jury's determination on the death penalty.

### A.

In recommending that Chaney be sentenced to death, the jury found four aggravating circumstances beyond a reasonable doubt, each of which included the finding that Chaney personally killed the two victims. Oklahoma law prohibits the imposition of the death penalty unless the jury determines that any aggravating circumstances found are not "outweighed by the finding of one or more mitigating circumstances." Okla.Stat.Ann. tit. 21, § 701.11. In addition, the judge must impose a sentence of life imprisonment "[i]f the jury cannot, within a reasonable time, agree as to punishment." *Id.*

Oklahoma law also provides that "[i]n the [capital] sentencing proceeding, evidence may be presented as to *any* mitigating circumstances." Okla.Stat.Ann. tit. 21, § 701.10 (West 1983) (emphasis added). The Oklahoma Court of Criminal Appeals recently stated that *"[c]ertainly the degree of participation in the entire chain of events may be presented in mitigation of the degree of punishment to be imposed."* Hatch v. State, 662 P.2d 1377, 1383 & n. 4. (Okl.Cr.1983) (emphasis added).

The Supreme Court has held that:

[T]he Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and *any of the circumstances of the offense* that the defendant proffers as a basis for a sentence less than death.

*Eddings v. Oklahoma,* 455 U.S. 104, 110–12, 102 S.Ct. 869, 873–75, 71 L.Ed.2d 1 (1982) (earlier emphasis in original, later emphasis added) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality opinion)). *See also Bell v. Ohio,* 438 U.S. 637, 642, 98 S.Ct. 2977, 2980, 57 L.Ed.2d 1010 (1978) (plurality opinion); *Roberts v. Louisiana,* 431 U.S. 633, 637, 97 S.Ct. 1993, 1995, 52 L.Ed.2d 637 (1977) (per curiam) (emphasis added) ("[It] is essential that the capital-sentencing decision allow for consideration of *whatever mitigating circumstances may be relevant to either the particular offender or the particular offense."*); *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion) ("[T]he fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death."); *See also Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam) (exclusion of proffered testimony at sentencing phase under state hearsay rule violated due process because testimony went to critical issue in punishment phase and substantial reasons existed to assume its reliability); *Pennsylvania v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed. 43 (1937) ("[J]ustice ... requires ... that there be taken into account the circumstances of the offense together with the character and propensity of the offender.").

We conclude that the withheld evidence might have affected the jury's imposition of the death penalty here for three reasons.

First, the evidence withheld here is mitigating evidence because it relates to the circumstances of the offense as a whole, and tends to support inferences that others were involved in the criminal episode, that Chaney may not have personally killed the victims, and that he may not have been present when they were killed. *See Blankenship v. State,* 251 Ga. 621, 308 S.E.2d 369, 371 (1983) (*Lockett* and *Eddings* require that defendant be allowed to offer as mitigating evidence in sentencing phase testimony that a third person was involved

---

22. In *Skillern,* the Fifth Circuit pointed out that a defendant may be convicted of felony murder "under the Texas law of parties and of criminal responsibility for the act of a confederate," even though the killing by the confederate occurred

in the course of another offense, and was not intended by the defendant on trial. The court found no Fourteenth Amendment barrier to the crime of felony murder. 720 F.2d at 846–47.

in murder, rape and aggravated sodomy). Chaney was unable to offer such evidence in mitigation at the punishment phase of his trial because the prosecutor withheld the FBI reports.[23]

Second, the withheld evidence is significant with respect to the aggravating circumstances in question. The aggravating circumstances found here by the jury to support the death sentence all rest on the conclusion that Chaney himself killed the victims.[24] Because the withheld evidence tends to support inferences that Chaney may not have been the sole participant in the criminal episode, and may not have personally killed the victims, or have been present at the time of the murders, the evidence might have caused the jury not to find these aggravating circumstances beyond a reasonable doubt.

Third, we note that the state trial judge instructed the jury at the sentencing phase that among the mitigating circumstances it could consider whether "the defendant was an accomplice in a murder committed by another person, and his participation in the homicidal act was relatively minor." IV R. 189. On this point the district attorney argued to the jury at the sentencing phase: "Has there been *any shred of evidence* in this case about anyone who committed this crime except Larry Chaney. That [mitigating circumstance] has no application here." VI R. 1285 (emphasis added). The argument of the prosecutor might well have been undermined, and the jurors' reactions

to this mitigating circumstance might well have been different, if the withheld evidence had been before them. That evidence and the inferences from it therefore "might have affected" the jurors, or one of them, in deciding on the death penalty.

### B.

With respect to both the aggravating and mitigating circumstances issues, the most critical piece of withheld evidence is the FBI report containing Ms. Weaver's statement. The report says that Ms. Weaver stated that she observed Mrs. Ashmore with an unidentified man and woman in the Ashmores' pickup truck in Jenks, a small community two or three miles south of Tulsa, at 4:10 p.m. on March 17. The State's case at trial, however, placed Chaney near Sallisaw, Oklahoma, over 100 miles away, at that time. Two of the State's witnesses placed Chaney on the tract of land he leased outside of Sallisaw at 4:30 p.m., near where the bodies were later found. Other evidence of the State indicated that Chaney made a telephone call from a convenience store near Sallisaw at 4:39 p.m. In addition, the State placed the time of death as the afternoon of March 17.

Thus, this FBI report lends support to Chaney's argument in the penalty phase of his trial that others were involved in the crime and that he was not present when the murders occurred. The evidence supports the inference that another person

---

**23.** Chaney argues that he need not meet the *Agurs* due process standards of materiality because in any event the prosecutor's withholding of the FBI reports violated his Eighth and Fourteenth Amendment right to present mitigating evidence to the jury before a death sentence is imposed. We need not decide whether the Eighth and Fourteenth Amendments guarantee defendants an absolute right to obtain mitigating evidence held by the prosecutor. We conclude that the withheld evidence might have affected Chaney's sentence and thus uphold Chaney's right to obtain the evidence under the *Brady* and *Agurs* rationale, without relying on Chaney's separate theory concerning an absolute right to mitigating evidence.

**24.** The jury found all four of the aggravating circumstances argued by the state to be present:
1) The defendant knowingly created a great risk of death to more than one person in that he did in fact kill, without authority of law, two persons, Kendal Inez Ashmore and Kathy Ann Brown, as the evidence shows.

2) The defendant committed the murder for remuneration or the promise of remuneration in that the evidence shows that the defendant kidnapped and killed both Kathy Ann Brown and Kendal Inez Ashmore and was attempting to extort $500,000 from the family of Kendal Inez Ashmore.

3) The murder was especially heinous, atrocious and cruel in that the defendant bound the victims and choked them to death with pieces of cloth and buried their bodies in a shallow grave.

4) The murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution in that the evidence shows that the defendant killed the victims after kidnapping them in order to prevent them from testifying against defendant for the kidnapping charge.

I R. 251; IV R. 198. *See* Okla.Stat.Ann. tit. 21, § 701.12(2), (3), (4), (5).

was involved because of the presence of the unidentified man with Mrs. Ashmore, while Chaney was placed over 100 miles away. Because the murders were said to have occurred that afternoon, Mrs. Ashmore's location in Jenks late that afternoon would place her over 100 miles away from Chaney at the time the State said that her murder occurred.

■ Both the state trial court and the federal district court emphasized two points with respect to the FBI report containing Ms. Weaver's statement. First, they pointed to the testimony of district attorney Fallis at the state court hearing on Chaney's application for post-conviction relief that Ms. Weaver changed part of her statement prior to Chaney's trial, and was said to have stated that she could not now identify Mrs. Ashmore as one of the two women in the truck.[25] At the outset, we note that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution. Brady*, 373 U.S. at 87, 83 S.Ct. at 1196 (emphasis added). In any event, such a subsequent change on this point by Ms. Weaver does not eliminate the evidentiary value of the FBI report itself, which would have been admissible at the penalty phase of the case.

At that critical penalty phase we are convinced that the reports themselves would have been admissible under constitutional requirements. Counsel for the State said at argument before us that he would not want to contend that the FBI report containing the Weaver statement could not be introduced; he preferred "for us to assume, since this is a death penalty case, that it could have been introduced into evidence." Transcript of Oral Argument at 21–22. We agree.

We feel that *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam), applies with special force here. In *Green*, during the penalty phase the defendant was denied the opportunity to introduce the testimony of a third party repeating a statement of Green's confederate in the abduction, rape and murder episode. The excluded statement of the confederate confided that he had shot the victim after ordering Green to run an errand. The exclusion of the proof during the penalty phase was held to be constitutional error. The Supreme Court stated:

Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was highly relevant to a critical issue in

---

**25.** We are troubled by the apparent inconsistency in the record on whether Ms. Weaver made this statement about the FBI report *before* Chaney's trial. Mr. Fallis testified at the state court hearing that "it is my recollection, she could not identify this person as being Mrs. Ashmore." IX R. 25. Fallis was asked on cross examination at the hearing about contacts with the witnesses: "these three different people [Weaver, Hamilton and West] were checked out back during the course of the [pretrial] investigation and also later after [defendant's attorney] filed his post-conviction appeal; is that correct," Fallis replied, "[t]hat is correct, sir." *Id.* at 33.

Other evidence in the record, however, indicates that Ms. Weaver may not have said she could not "now" say Mrs. Ashmore was in the truck until *after* the September 1977 trial when she was contacted by the prosecutor's staff in connection with the May 1981 post-conviction proceedings:

[Chaney's attorney:] Mr. Fallis, were you aware of any statements whether made orally to investigative [agents] or possibly reduced to writing which could be construed as a recantation or a denial of any of the information contained in [the FBI reports containing the

Weaver and Hamilton statements] *prior to September 1977?*
[Fallis:] No,—you mean by the author?
[Chaney's attorney:] By the witness.
[Fallis:] *No, I'm not aware of that.*

IX R. 18–19 (emphasis added). Later, after stating that "it is my recollection, [Ms. Weaver] could not with certainty identify this person as being Mrs. Ashmore," *id.* at 25, Fallis stated that "[a]s a precaution, based upon having received your notification in the [post-conviction proceeding], she was talked to again by an investigator from my office. Her response was 'I couldn't identify the woman *now*, I can't identify her *now*.'" *Id.* (emphasis added). Later, Fallis stated that "[s]he recanted after [Chaney] filed for post-conviction relief .... I think that is exactly why it was not considered to be valuable information to us or anybody—she couldn't identify them. That certainly was not recanting." *Id.* at 34.

Thus it is not clear whether Ms. Weaver stated by the time of trial in September 1977, or not until sometime before the May 1981 postconviction proceeding, that she was not then able to say that Mrs. Ashmore was in the truck on the afternoon of March 17.

the punishment phase of the trial, *see Lockett v. Ohio*, 438 U.S. 586, 604–605 [98 S.Ct. 2954, 2964–2965, 57 L.Ed.2d 973] (1978) (plurality opinion); *id.* at 613–616 [98 S.Ct. at 2969–2970] (opinion of Blackmun, J.), and substantial reasons existed to assume its reliability.

*Id.* at 97, 99 S.Ct. at 2151. *See also Chambers v. Mississippi*, 410 U.S. 284, 300–03, 93 S.Ct. 1038, 1048–49, 35 L.Ed.2d 297 (1973); Hertz & Weisberg, *In Mitigation of the Penalty of Death: Lockett v. Ohio and the Capital Defendant's Right to Consideration of Mitigating Circumstances*, 69 Calif.L.Rev. 317, 365–66 (1981) (discussing *Green*). We thus conclude that the admissibility of the report here is in accord with the Supreme Court's guidance.

Ms. Weaver's statements in the FBI reports similarly were relevant to a critical issue in the punishment phase—whether Chaney acted alone and himself killed the victims, or whether others were involved who committed the murders, and whether Chaney was present at that time. Furthermore, there are indicia of reliability here. Ms. Weaver made her statement within five days of the kidnappings to a responsible investigative agency and they were promptly recorded (the FBI report cover

sheet is dated April 5, 1977). Other evidence corroborates Ms. Weaver's statement that she saw Mrs. Ashmore in Jenks at approximately 4:10 p.m. on March 17 in the parking lot. Her statement was that two fire trucks and two police cars with sirens went by while she was in the parking lot; it was stipulated at the post-conviction hearing that the Jenks fire department answered a call at 4:08 p.m. on March 17 and that the likely route of the fire trucks would have taken them by this grocery store.

Moreover, if Chaney's counsel had had knowledge of Ms. Weaver, and had called her as a witness at the sentencing phase in September 1977, and she had then been unable to testify that Mrs. Ashmore was one of the women in the Ashmores' truck in Jenks at 4:10 p.m. on March 17, Chaney's counsel could then have introduced the FBI report in evidence under the recorded recollection exception to the hearsay rule.[26] In addition, we note that the change of recollection by Ms. Weaver did not affect other significant points. The district attorney indicated that Ms. Weaver could not later identify Mrs. Ashmore as having been in the truck; there is no evidence in the record that prior to Chaney's trial Ms. Weaver indicated that she could not identi-

**26.** For example, in *United States v. Booz*, 451 F.2d 719 (3d Cir.1971), *cert. denied*, 414 U.S. 820, 94 S.Ct. 45, 38 L.Ed.2d 52 (1973), the Third Circuit approved the admission of an FBI report in similar circumstances. At trial, an FBI agent testified that a witness had given him a license number. After referring to a written FBI report, the agent testified as to the particular license number given him by the witness. The Third Circuit held that

> Where as here, a record is the joint product of two individuals, one who makes an oral statement and one who embodies it in a writing, if both parties are available to testify at trial as to the accuracy with which each performed his role, the recollection may be admitted.... If [the FBI agent] can verify the accuracy of his transcription and if [the witness] can testify he related an accurate recollection of the number to [the agent], we believe that, even though [the witness] may not have read the report, sufficient indicia of its accuracy exist to let the evidence go to the jury.

*Id.* at 725. Here, similar indicia of the FBI report's accuracy support its admission into evidence.

As Wigmore states, "[i]t cannot be doubted that the use of a recorded past recollection ... now occupies a firm and unassailable place in our practice and doctrine." 3 J. Wigmore, *Evi-*

*dence in Trials at Common Law* § 736, at 84 (Rev'd J. Chadbourn 1970). For a discussion of the common law recorded recollection exception in Oklahoma, *see Lay v. State*, 461 P.2d 1021, 1023 (Okl.Cr.1969); *Rasbury v. State*, 303 P.2d 465, 469–70 (Okl.Cr.1956); Note, *Evidence: Present Recollection Revived and Past Recollection Recorded*, 12 Okla.L.Rev. 165 (1959). *See generally* 3 J. Wigmore, *supra*, §§ 734–755; *McCormick's Handbook of the Law of Evidence* §§ 299–303 (E. Cleary 2d ed. 1972). Section 2803(5) of the Oklahoma evidence code, which went into effect after Chaney's trial, codifies the recorded recollection exception. Okla.Stat.Ann. tit. 12, § 2803(5) (West 1980).

Our conclusion that Ms. Weaver's statement in the FBI report, in the circumstances outlined above, could be read into evidence under the recorded recollection exception is not undercut by rules making statements nonadmissible under the public records exception. Under the analogous federal rules of evidence, federal courts have held that a statement's nonadmissibility under the public records exception does not foreclose its admissibility under the recorded recollection exception if the agent who took the statement testifies. *See, e.g., United States v. Sawyer*, 607 F.2d 1190, 1193 (7th Cir.1979), *cert. denied*, 445 U.S. 943, 100 S.Ct. 1338, 63 L.Ed.2d 776 (1980).

fy the Ashmore truck or could not recall that a man and two women were in the truck at the critical 4:10 p.m. time in Jenks the day of the kidnapping when the State's evidence placed Chaney some 100 miles away near Sallisaw.[27]  And, as noted, there was a stipulation about the time of the firetrucks passing by the store which agreed with the time she had given, almost to the minute, and therefore corroborated her statement to the FBI. Thus, even with an indication that a portion of her statement could not be supported by later testimony, the significance of the FBI report on Ms. Weaver's statement remains.

Second, the state trial judge and the federal district judge emphasized that Chaney did not call Ms. Weaver at the state court post-conviction hearing. The State likewise argues that the withheld reports are not significant because Chaney's counsel had spoken to the witnesses before the state and federal post-conviction hearings and declined to call them. Brief of Appellee at 13, 15. Once Chaney's counsel had learned the identity of the FBI agents who had taken the witness statements, he sought to reopen the state court post-conviction proceedings and subpoena the agent who had taken Ms. Weaver's statement. X R. 3. The court refused to reopen the post-conviction proceedings. Moreover, this emphasis on the failure of Chaney's counsel to call these witnesses at the post-conviction proceeding does not come to grips with the importance of the reports themselves—reports containing material statements which would have been admissible at the penalty phase of the trial, even without testimony by the witnesses who were interviewed by the FBI.

We are convinced that the FBI reports containing the Hamilton, West and Ashmore statements also are of significant evidentiary value themselves. Like the FBI report containing Ms. Weaver's statement, important indicia of reliability under *Green* support these reports; the statements were

made to the FBI within two weeks after the kidnappings and were promptly recorded. According to the report containing Hamilton's statement, he said that he observed the Ashmore pick-up truck arrive at 91st Street and Memorial Avenue between 8:00 a.m. and 8:30 a.m. on March 18. He observed the driver depart from the truck and enter a waiting black car which drove away. At the state court hearing on Chaney's application for post-conviction relief, district attorney Fallis said that the Hamilton statement was not exculpatory because the truck had been discovered thirty minutes to an hour earlier, and that the man Hamilton saw was an employee of Mr. Ashmore. We note, however, that the evidence at trial indicated that an FBI agent discovered the truck at 9:00 a.m. on March 18. Moreover, in its order denying Chaney's post-conviction application, the state district court noted that "[a]t 9 a.m. on March 18, an FBI agent discovered the Ashmore truck as 91st Street and Memorial [Avenue] in Tulsa." I R. 238. In addition, evidence that the pick-up truck's driver left in a waiting black car is indicative of another possible participant in the criminal venture. These circumstances undermine the prosecuting attorney's explanation for not producing the Hamilton statement.

The West statement to the FBI was that on March 17 he saw a "shiny red" pickup truck parked at 91st Street and Memorial Avenue at 4:00 p.m. to 4:30 p.m. while riding a bus home from school, and again at 5:30 p.m. while on his way to soccer practice. West did *not* say that he observed a blue and white pickup truck such as the one owned by the Ashmores. Chaney's counsel argues that the West statement contradicts the state's position at trial that the Ashmore truck had been abandoned before 5:00 p.m. to 6:00 p.m. on March 17 at 91st Street and Memorial Avenue. Petitioner's Opening Brief at 7–8. Viewing the West statement in conjunction with the State's position at trial, we cannot agree with the State's argument that the

---

27. In the federal habeas hearing, Chaney's attorney stated that Ms. Weaver "indicated to me when I spoke with her [before the state court post-conviction hearing] that she in fact did not make those statements, was not sure, and was not sure at this time, which was April of '81, nor was she sure in March of 1977 when Agent McLain talked with her." XI R. 9. This statement, based on an interview with Ms. Weaver four years after the trial, is the only indication

in the record that Ms. Weaver could not identify the Ashmore truck or could not recall that a man and two women were in the truck at 4:10 p.m. in Jenks. In its order overruling Chaney's application for an evidentiary hearing, the district court stated only that both the district attorney and Chaney's counsel had indicated that Ms. Weaver had stated that she could not testify that the woman she saw on March 17 was Mrs. Ashmore. I R. 129 & n. 7.

West statement "has totally no relationship to the case." IX R. 25.

The FBI report containing the Ashmore statement further strengthens the conclusion that the withheld evidence as a whole might have affected the death sentence determination by the jury. Although we agree that Mr. Ashmore's statement to the FBI that the caller's remark in the first telephone conversation ("There are four of us. We're not kidding. If your wife tries anything like that Honky who works for you, we'll do her the same way.") is similar to statements made by the caller in the other two taped extortion calls played to the jury,[28] the statements in all of the FBI reports must be viewed together for their cumulative effect. As the Third Circuit has explained, "[c]ertainly, the effect of each nondisclosure not only must be considered alone, for the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently 'material' to justify a new trial [or a resentencing proceeding]." *United States ex rel. Marzeno v. Gengler*, 574 F.2d 730, 736–37 (3d Cir.1978). *See also* 3 C. Wright, *Federal Practice and Procedure* § 557.2, at 359 (2d ed. 1982) ("It is not uncommon that defendant claims that several different pieces of evidence should have been disclosed. In weighing their materiality, presumably the cumulative effect of the nondisclosed evidence must be considered."). Viewed in this light, we conclude that the FBI reports concerning the West and Ashmore statements, together with the reports

on the Weaver and Hamilton statements, might have affected the jury's imposition of the death penalty.

The significance of the withheld evidence is underscored by *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In the conclusion of its opinion, the Supreme Court held the imposition of the death penalty unconstitutional "in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken." *Id.* at 801, 102 S.Ct. at 3379. In this context, the significance of the withheld evidence here is that it tends to undermine the aggravating circumstances found to support the imposition of the death penalty, all four of which were based on the finding that Chaney personally killed the victims.[29] *See Hatch v. State*, 662 P.2d 1377, 1382–83 (Okl.Cr.1983) (Court vacated death sentence imposed after a trial to the court and remanded because "in light of *Enmund*, we deem it necessary for the sentencer to give greater attention to the evidence concerning the [defendant's] individual participation and intent in the events which culminated in the murder/shootings."). Indeed, the views of the four dissenters in *Enmund* would demand consideration of circumstances such as are indicated by the withheld FBI reports: "Repeatedly, this Court has emphasized that capital sentencing decisions must focus 'on the circumstances of each individual homicide and individual defendant.'" 458 U.S. at 827, 102 S.Ct. at 3392 (O'Connor, J., dissenting) (quoting *Proffitt v.*

---

**28.** In the second telephone conversation between Mr. Ashmore and the extortionist, the caller in giving directions to Mr. Ashmore on where to place the $500,000 ransom money, stated, *"My man's* going to pull in there and pick it up, and if anything comes down I'm going to know about it and your old lady's going to know about it. And I'm going to tell you what, one hour after *we* pick up that money *we're* going to check everything and make sure it's all right .... One hour after *we* pick that money up ...." VI R. 361–62; I R. 239–40 (emphasis added). In the third telephone conversation, after Mr. Ashmore delivered the ransom money to the rodeo ground, the caller stated, *"We* passed your truck ...." VI R. 373; I R. 242 (emphasis added).

**29.** Chaney also argues that "the penalty stage instructions did not adequately deal with the difference between vicarious liability under the

Oklahoma felony murder statute and the personal responsibility required to constitutionally impose the death penalty under *Enmund*." Petitioner's Opening Brief at 27. We need not reach this argument because we are holding the death penalty determination invalid on other grounds.

In any further sentencing proceedings, careful jury instructions must explain the essential elements required by *Enmund* before a death sentence can be imposed. As the Court explained in *Enmund*, "[f]or purposes of imposing the death penalty, [the defendant's] criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt." Before a death penalty can be imposed it must be proven beyond a reasonable doubt that Chaney killed or attempted to kill the victim, or himself intended or contemplated that the victim's life would be taken. 458 U.S. at 801, 102 S.Ct. at 3378.

*Florida,* 428 U.S. 242, 258, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1976)).

We are convinced that the withheld evidence, considered as a whole in conjunction with the trial record, "might have affected" the jury's decision on the death penalty under the *Agurs* test. We again note that in his final rebuttal argument for the death penalty, the prosecuting attorney relied heavily on his rhetorical question whether there was any *"shred of evidence"* pointing to another participant (emphasis added), and argued that the jury should reject mitigation based on the ground that there was an accomplice. The withheld FBI reports might well have made the jurors, or one of them, doubt this position of the prosecutor. The withheld reports contained important mitigating evidence supporting the inference that another person or persons were involved in the kidnappings and murders, and that Chaney may not have personally killed the victims or have been present when they were killed. Moreover, the withheld evidence tends to undermine the aggravating circumstances found by the jury to support the imposition of the death penalty, which were all premised on the finding that Chaney himself killed the victims. Therefore, we conclude that there was constitutional error in refusing to disclose the reports after the specific pretrial request for such evidence.

## V

The question remains as to the proper disposition of the case in view of the conclusions we have reached.

In this connection Chaney's counsel made an alternative request that this court order that an evidentiary hearing be held by the federal district court if we refuse to order a new trial or a resentencing proceeding. *See* Petitioner's Opening Brief at 36–41; Petitioner's Reply Brief at 13–14. Since we have concluded that the previously imposed death sentence cannot constitutionally stand, a new sentence will be imposed and the terms of Chaney's request will not require a federal evidentiary hearing.[30]

We are convinced for further reasons that our disposition need not require a federal evidentiary hearing. As explained earlier, we are convinced that the FBI reports themselves were and are independently admissible in light of the indicia of their reliability and the principles of *Green v. Georgia.* The FBI reports on the Weaver, Hamilton and West statements and their cover pages were offered and admitted in evidence at the May 1, 1981 state court postconviction hearing, and the State announced it had "[n]o objections" to the reports. IX R. 37. The FBI report on Mr. Ashmore's statement was not released until 1982, after the state court proceedings were completed, but this report was made part of this habeas record as an exhibit to the petition. The State's response did not object to the authenticity of this report, although the State argued that it was not material. Neither Chaney nor the State sought to have Weaver, Hamilton or West testify in the federal proceedings on the subject matter of their statements, and the State opposed an evidentiary hearing.[31]

---

**30.** Chaney based his request for an evidentiary hearing in the federal district court on 28 U.S.C. § 2254(d)(2), (3) & (6). I R. 128 n. 2. In denying Chaney's request for a hearing, the court stated that

the fact finding procedures employed by the state court were adequate to afford a full and fair hearing to petitioner [§ 2254(d)(2) ]; the material facts were adequately declared at the state court hearing [§ 2254(d)(3) ]; and the petitioner did receive a full, fair and adequate hearing in the state court proceeding [§ 2254(d)(6) ]. Because petitioner has failed to prove the existence of one or more enumerated exceptions to 28 U.S.C. § 2254(d), the Court is not required to provide an evidentiary hearing.

I R. 133–34. The court also declined to exercise its discretionary power to conduct a hearing

under *Townsend v. Sain,* 372 U.S. 293, 318, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963) because petitioner had had every reasonable opportunity to present to the state courts his claim that *Brady* material was withheld from him and the state court after due and proper hearing has concluded to the contrary. At this point, the Court cannot conclude the record would be augmented in any material way by petitioner's requested evidentiary hearing. The Court thus declines to exercise its discretion in this regard.

I R. 134 (footnote omitted).

**31.** Chaney's counsel stated that he wanted to call Mr. Ashmore, the state prosecutor, the FBI agent who took Weaver's statement, and the agent who took Mr. Ashmore's statement. I R. 130–31; XI R. 8–15.

Thus we have a documentary record presented of the FBI reports which were themselves admissible. From that documentary record, considered with the state trial record, we are convinced that the withheld reports "might have affected" the jurors, or at least one of them, in their determination on the death penalty. We do not know what the witnesses might have said at the trial in September 1977, but we do know the contents of their statements as made to the FBI within a few days after the events and promptly recorded. Even with changes in their recollection that testimony by these witnesses could make, we must hold that the withheld evidence might have affected the jurors' determinations on the death penalty. This being our conclusion in light of the undisputed documentary record, we are not persuaded that a further federal evidentiary hearing is required.

On the record before us, under controlling federal constitutional decisions we must hold that as in *Brady*, 373 U.S. at 89–91, 83 S.Ct. at 1197–98, although petitioner's first degree murder conviction is not invalid, the death penalty imposed fol-

lowing such error must be adjudged constitutionally infirm. Accordingly, the order of the District Court for the Northern District of Oklahoma is affirmed with respect to the denial of the writ; the order is reversed with respect to its denial of all further relief. The case is remanded to the District Court with directions to enter judgment that the writ of habeas corpus is denied but that, determining the case as law and justice require,[32] the death sentence of petitioner heretofore imposed is adjudged invalid under the Eighth and Fourteenth Amendments to the United States Constitution,[33] and the execution of the petitioner under this invalid death sentence is enjoined;[34] that the judgment is without prejudice to further proceedings by the State for re-determination of the sentence on the conviction, at which proceedings the petitioner is afforded an opportunity to present all evidence relevant to mitigating circumstances or to the aggravating circumstances alleged, including the withheld evidence discussed herein, along with any other evidence relevant to the sentencing proceedings.[35]

**32.** The federal habeas statute empowers the federal courts to make disposition of the matter "as law and justice require." 28 U.S.C. § 2243; *Carafas v. LaVallee*, 391 U.S. 234, 239, 88 S.Ct. 1556, 1560, 20 L.Ed.2d 554 (1968); *Sanders/Miller v. Logan*, 710 F.2d 645, 656 (10th Cir.1983).

**33.** We are mindful that the *Brady* rationale rests on the Due Process Clause of the Fourteenth Amendment. We allude also to the Eighth Amendment because the substantive materiality of the withheld evidence in question arises from Eighth Amendment demands that the sentencer "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455, U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality opinion) (emphasis in original)).

**34.** Our stay of petitioner's execution entered on July 15, 1983, 712 F.2d 441, is continued through the entry of the judgment on remand, which will enjoin the execution of petitioner under the invalid death sentence.

**35.** The Oklahoma courts will determine, if the prosecuting authorities seek a new evidentiary hearing on the penalty, whether in these cir-

cumstances there can be a sentencing phase hearing alone to resentence Chaney, or whether the State must retry him in order to seek the death penalty. *See* Okla.Stat.Ann. tit. 21, § 701.-10 (West 1983) ("The [sentencing] proceeding shall be conducted by the trial judge *before the trial jury* as soon as practicable without a presentence investigation.") (emphasis added). We also note that under Oklahoma law, a life sentence may be imposed for a conviction for murder in the first degree if a death sentence is ruled unconstitutional. *See id.* tit. 21, § 701.-9(A) ("A person who is convicted of or pleads guilty or nolo contendere to murder in the first degree shall be punished by death or by imprisonment for life."); *id.* tit. 21, § 701.15 ("In the event the death penalty is held to be unconstitutional by the Oklahoma Court of Criminal Appeals or the United States Supreme Court, the court having jurisdiction over a person previously sentenced to death shall cause such person to be brought before the court, and the court shall sentence such person to imprisonment for life.").

The Oklahoma Court of Criminal Appeals has modified death sentences imposed as mandatory punishment under Oklahoma statutes to sentences of life imprisonment following Supreme Court decisions holding such mandatory death penalties unconstitutional. *E.g., Roberts v. State,* 564 P.2d 246 (Okl.Cr.1977); *Brown v. State,* 563 P.2d 1182 (Okl.Cr.1977); *Miller v. State,* 560 P.2d 579 (Okl.Cr.1977).

In closing, the court wishes to acknowledge that we have been substantially assisted by the conscientious and able briefing and arguments by all counsel for the petitioner and the State.

IT IS SO ORDERED.

## ORDER

The petition for rehearing with a suggestion for rehearing in banc makes two principal arguments. We are not convinced by either contention.

*First*, the State says that the motion of petitioner Chaney to produce *Brady* evidence was only a general request and that we applied the incorrect *Agurs* test. The argument overlooks significant points. Petitioner's counsel did not have the names of persons whose statements had been taken and therefore requested, *inter alia*, favorable or exculpatory statements of all persons interviewed by state investigators, city police or any other governmental agency and transcriptions of any oral statements made to such agencies. I R. 59–60. More importantly, in response to petitioner's motion, the state district court specified that the State produce, among other things, any and all evidence in the custody of the District Attorney's office, *the Federal Bureau of Investigation*, and other named agencies which may be favorable to the petitioner or is exculpatory. IV R. 78–79. The specificity of the request must, of course, be judged on the facts of each case and the circumstances here strongly support petitioner's position that the request was as specific as it could be. Indeed, at argument before us, counsel for the State conceded that in this case "it may not be possible to be more specific," stating merely that it may be that such requests should always be considered general. (Tr. Oral Argument 27–28). *See United States v. Warhop*, 732 F.2d 775, 778 (10th Cir. 1984). We remain convinced that our holding is correct, particularly in light of the general rule that "[e]vidence must be reviewed under the *Agurs* specific request standard when there is uncertainty about the request." *King v. Ponte*, 717 F.2d 635, 640 (1st Cir.1983) (citing *United States ex rel Marzeno v. Gengler*, 574 F.2d 730, 736 (3d Cir.1978)). In death penalty cases the rule should apply with special force when the demands of due process for fairness in all phases of the trial are the strongest.

*Second*, the State claims that the invalidation of the death penalty without a hearing was unfair to the State. However, the State opposed an evidentiary hearing in the federal district court, stating that there was a sufficient factual basis presented from the state trial and the state post-conviction proceedings. (*See* XI R. 21, Transcript of June 17, 1983, federal habeas hearing). The petitioner relied primarily on the documentary record from the state court post-conviction proceeding where the F.B.I. statements were introduced without objection by the State, as discussed in our opinion. The essentials of the record are the withheld statements which we have held admissible. Moreover, at argument before us counsel for the State said he did not want to contend that the Weaver statement to the FBI could not be introduced and that he preferred "for us to assume, since this is a death penalty case, that it could have been introduced into evidence." (Tr. Oral Argument 21–22). Since we remain convinced that such admissible evidence in the form of the withheld statements, by its own impact, might have affected the choice of the penalty, the death sentence must be held invalid.

A further complaint is made that the State must have a complete new trial if it is to reimpose the death penalty instead of a life sentence. We considered this circumstance in our opinion at n.35. The State's difficulty arises because the state prosecutor withheld the evidence. Such circumstances in no way justify disregarding fundamental constitutional violations which flawed the fairness of the trial.

Accordingly, the petition for rehearing is denied by the panel. No member of the panel and no judge in regular active service on the court having requested a poll, the suggestion for rehearing in banc is also denied. Rule 35, F.R.A.P.